**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

LOU DIBELLA,

               *Plaintiff*,

    v.

JASON GUILLOT and
THALHIMER REALTY PARTNERS, INC.,

               *Defendants*.

Civil Action No. 3:26-cv-486

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff Lou DiBella in support of his Complaint against Defendants Jason Guillot and Thalhimer Realty Partners, Inc. states as follows:

## NATURE OF THE ACTION

1.  This action is a straightforward case of defamation. It arises from Defendants' knowingly false and defamatory statements to a Richmond City official and others accusing Plaintiff Lou DiBella of extortion. Sometime between April 7 and April 9, 2026, Jason Guillot—a Principal at Thalhimer Realty Partners, Inc.—told Angie Rodgers—the Director of Economic Development for Richmond's Economic Development Authority ("EDA")—that DiBella threatened to kill Guillot and his family if Guillot did not sell DiBella a certain parcel of land.

2.  Guillot's statement is false, and Guillot knew it was false when he made it. Guillot claimed that DiBella made this threat directly to him during a conversation they had with Larry Botel—DiBella's business partner—on April 7, 2026, during opening night of a new baseball stadium for the AA Minor League Baseball team, the Richmond Flying Squirrels.

3.  DiBella is the managing partner of Navigators Baseball LP—the limited partnership that owns the Squirrels. Botel is another partner. They and the team have been locked

in contentious business dealings with Defendants, the City of Richmond, and the EDA for years over the Squirrels' new stadium, which is the flagship property in the Diamond District, a proposed $2.4 billion mixed-use development project in the heart of Richmond.

4.      The contract to develop the Diamond District was initially awarded in 2022 to RVA Diamond Partners LLC, a group made up of Thalhimer Realty Partners, Inc. (Guillot's company) and two other firms.  RVA Diamond Partners fell apart shortly after winning the contract, leaving Guillot and Thalhimer to spearhead development of the Diamond District with the City and EDA.

5.      Guillot's motive for making this false and defamatory statement to Rodgers and others is clear: he hoped to bias Rodgers against DiBella and create leverage for Thalhimer and the EDA in their business dealings with DiBella and the Squirrels.  Guillot also sought to retaliate against DiBella for threatening to blow the whistle on material misrepresentations that Guillot, Thalhimer, and RVA Diamond Partners made to win the Diamond District contract and after, including during a meeting with Major League Baseball ("MLB") in September 2023.

6.      Rather than compete fairly and negotiate with DiBella in good faith to resolve their disputes, Defendants slandered DiBella's good name and hard-earned reputation to gain the upper hand in their business dealings.  DiBella brings this action to vindicate his reputation and hold Defendants accountable for knowingly lying to a City official and others by falsely accusing DiBella of criminal conduct.

## PARTIES AND RELEVANT NON-PARTIES

7.      Plaintiff Lou DiBella is a citizen of the State of New York and the United States who resides and is domiciled in New York.  He is a boxing promoter and entertainment producer. He is the president of DiBella Entertainment and the managing partner of Navigators Baseball LP, the limited partnership that owns the AA Minor League Baseball team, the Richmond Flying Squirrels.  DiBella is the only partner with authority in dealings between the Squirrels and MLB.

8.      Defendant Jason Guillot is a citizen of the Commonwealth of Virginia and the United States who resides and is domiciled in Virginia.  He is a commercial real estate developer and a principal at Thalhimer Realty Partners, Inc.

9.      Defendant Thalhimer Realty Partners, Inc. is a real estate development corporation that is incorporated under the laws of the Commonwealth of Virginia and has its principal place of business at 11100 West Broad Street, Glen Allen, Virginia.  Thalhimer invests in, develops, and manages commercial and residential real estate across Virginia and was part of the group awarded a contract to develop the Diamond District—a major mixed-use development project in the heart of Richmond.  Thalhimer assigned Guillot to be its point person on the Diamond District project and in dealings with the City of Richmond and the EDA.

10.     Non-party RVA Diamond Partners LLC was the development group to which the City of Richmond awarded the contract to develop the Diamond District in 2022.  RVA Diamond Partners purported to be made up of Republic Projects LLC, Thalhimer, and Loop Capital Markets, LLC.  However, in 2023, Republic left the group, and in subsequent legal filings, Loop Capital claimed it was never part of the group.  Rather than resolicit bids when Republic left RVA Diamond Partners, the City kept Thalhimer—even though Thalhimer is ill-equipped to lead development of a project of the magnitude that was bid out—to avoid another lengthy, public solicitation and bidding process.

11.     As a result, development of the Diamond District is far behind schedule.  Phase 1—which was to include the Squirrels' new stadium along with housing, a hotel, and retail space—

3

was initially scheduled for completion in 2026.[1]   Only the Squirrels' stadium is complete; Thalhimer, the City, and the EDA have not broken ground on any other Phase 1 property.

12.     Non-party the Richmond Economic Development Authority ("EDA") is the primary Richmond government entity overseeing the Diamond District.  It is DiBella and the Squirrels' main point of contact with the City concerning the stadium and the Diamond District. The EDA's mission is to "attract, retain, and support business in Richmond, Virginia."

13.     Non-party Angie Rodgers is the Director of Economic Development at the EDA and has held that role since August 2025.  She is now responsible for managing and overseeing Richmond's efforts to develop the Diamond District, even though she was not involved in the original planning or bid processes.

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332 because there exists complete diversity of citizenship between DiBella, who is a citizen of New York, and Defendants, who are citizens of Virginia, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

15.     This Court has general personal jurisdiction over Guillot because he is a citizen of and is domiciled in Virginia.  This Court has general personal jurisdiction over Thalhimer because it is incorporated and has its principal place of business in Virginia.

16.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to DiBella's defamation claim occurred in this District.

---

[1] *See* Richmond City Council, Diamond Dist. Finance Pres., at 25 (Sept. 15, 2022), *available at* https://richmondva.legistar.com/LegislationDetail.aspx?ID=5838106&GUID=213E8CB0-E648-47E3-A403-AC2CDB0F3FCD&Options=&Search= (Phase 1a target completion date in 2025 and Phase 1b target completion date in 2026).

Defendants published their defamatory statement in this District, and DiBella suffered damage from that statement in this District.

## FACTUAL ALLEGATIONS

### *Lou DiBella brings the Flying Squirrels baseball team to Richmond.*

17.     Lou DiBella is a Brooklyn native and a graduate of Harvard Law School with a passion for sports, especially boxing and baseball.  He served as the Vice President and Senior Vice President in Charge of Programming at HBO Sports for over a decade, where he created and oversaw the highly successful series *Boxing After Dark* and *KO Nation*, before leaving in 2000 to start his own company, DiBella Entertainment.  He has promoted numerous world-class boxing talents and worked tirelessly to bring boxing matches back to Brooklyn, a goal he realized in 2016.

18.     Also in 2016, DiBella received the James A. Farley Award for Honesty and Integrity from the Boxing Writers Association of America ("BWAA").  This prestigious award "is not given to just anyone, or even given every year, candidates needing to keep their reputations unsullied for a long enough period to rise above the bull----."[2]  On information and belief, DiBella is the only boxing promoter ever to have won this award.

19.     In recognition of his many contributions to the sport, DiBella was inducted into the International Boxing Hall of Fame in 2020—his first year of eligibility.

20.     DiBella is also an avid baseball fan.  In 2005, DiBella (along with Navigators Baseball LP) purchased the Norwich Navigators—the AA Minor League Baseball team in Norwich, Connecticut affiliated with the San Francisco Giants.

---

[2] BWAA, *Lou DiBella Wins BWAA Farley Honesty and Integrity Award* (Jan. 20, 2016), https://www.bwaa.org/single-post/2016-1-20-lou-dibella-wins-bwaa-farley-honesty-integrity-award.

21.     In 2009, DiBella was instrumental in moving the team to Richmond, Virginia, expending substantial time, effort, and money to get buy-in from a wide array of stakeholders ranging from MLB to the mayor of Richmond, and more.  The team was renamed the Richmond Flying Squirrels.  Under DiBella's leadership, the Squirrels became one of the most beloved and successful franchises in Minor League Baseball, routinely topping attendance charts.[3]

### The City of Richmond promises to build the Squirrels a new stadium.

22.     When the Squirrels first moved to Richmond, the team played in a run-down stadium known as the "Diamond."  The Diamond is a 12,000-plus seat stadium that opened in 1985.  The Diamond was (and is) also home to the Virginia Commonwealth University ("VCU") baseball team, the VCU Rams.

23.     By 2009, the Diamond was almost 25 years old and well past its prime.  It had only one elevator to bring fans from the lower to upper concourses, limited concession options, a roof that leaked on rainy days, virtually no accessibility for the disabled and elderly, and not enough infrastructure to serve the 9,000 seats available for Squirrels' gamedays.

24.     As part of the agreement for DiBella to bring the Squirrels to Richmond, the City promised to build a new stadium for the Squirrels within three years.  But the City failed to do so.

### Richmond plans to make the Squirrels' new stadium the centerpiece of a new $2.4 billion mixed-use development project called the Diamond District.

25.     For more than a decade, DiBella worked tirelessly to try to make the City's promise of a new stadium for the Squirrels a reality.  In December 2021, it looked like DiBella might finally

---

[3] *See* Brennan Long, *How The Richmond Flying Squirrels Become One Of The South's Most Beloved Baseball Teams*, Southern Living (Apr. 10, 2025), https://www.southernliving.com/richmond-flying-squirrels-11710903.

succeed.  The City—under the auspices of the EDA—launched a public search for a private partner to lead a massive new $2.4 billion mixed-use development project called the Diamond District.

26.     The Diamond District was imagined as a redevelopment of 67 acres in the heart of Richmond that would feature a new stadium for the Squirrels as its anchor property.  Along with the new stadium, the Diamond District would include retail and office space, a hotel, multi-family residential units, and public parks.

27.     The City's decision to embark on this development project and build the Squirrels a new stadium came just in time.  Before the start of the 2021 baseball season, MLB took control of Minor League Baseball.  MLB issued new mandatory facility standards for Minor League stadiums.  The stadium in which the Squirrels played at the time, the Diamond, did not meet MLB's standards, nor could it be renovated to meet such standards.  So, if the Squirrels wanted to stay in Richmond, they needed a new stadium.

28.     In September 2022, after a months-long solicitation and bid process, the EDA selected RVA Diamond Partners LLC—purportedly made up of (1) Republic, a national real estate investment, management, and development enterprise; (2) Thalhimer (of which Guillot is a principal); and (3) Loop Capital, a minority-owned investment bank, brokerage, and advisory firm—as the private development group to partner with the City to develop the Diamond District.[4]

29.     Machete Group was runner up to RVA Diamond Partners in the City's bid selection process.  Machete Group is an industry-leading real estate development and development management firm specializing in arenas, stadiums, entertainment venues, and adjacent mixed-use

---

[4] City of Richmond, *Development Updates 2024: Diamond District*, at 5 (Apr. 8, 2024), https://rva.gov/sites/default/files/2024-04/Diamond%20District%20updated%20presentation.pdf.

7

projects.  Since its inception in 2017, the firm has overseen more than $5 billion of project scope including more than 20 sports venues.

30.    Unlike Machete, RVA Diamond Partners had no experience developing sports venues.[5]  From the initial, formal introduction between the City, RVA Diamond Partners, and the Squirrels, RVA Diamond Partners made it clear that it considered building the Squirrels' new stadium an act of philanthropy.  Even though the new stadium was to be the cornerstone of the Diamond District, the principal of Republic described it as an albatross that they were only building because they were forced to.  It was unsurprising, therefore, that RVA Diamond Partners appeared disinterested in or incapable of designing and overseeing construction of a top-notch, modern professional baseball stadium that would meet MLB requirements and satisfy the Squirrels' needs.

### *DiBella and the Squirrels take over building the new stadium and pledge to spend tens of millions of dollars of their own money to make it a reality.*

31.    Over the course of the next year, RVA Diamond Partners consistently failed to meet milestones to deliver the stadium on time.  For several months, RVA Diamond Partners made limited progress on design drawings, sending the Squirrels and the team's ballpark consultants multiple mockups that were basic and unprofessional for a project of this magnitude.  RVA Diamond Partners did not seek input from DiBella or the Squirrels regarding the new stadium, and RVA Diamond Partners' proposals were not reflective of the Squirrels or MLB's needs.

32.    RVA Diamond Partners also consistently failed to meet agreed deadlines with the City to close on portions of land, which had downstream impacts on infrastructure improvements associated with the stadium.  And they waited several months to develop any kind of bottom-up

---

[5] Bret McCormick, *Facilities and Ticketing: A Critical Meeting at MLB's Office Helps Richmond, Flying Squirrels Complete 15-year Stadium Mission*, Sports Bus. J. (Oct. 7, 2024), https://www.sportsbusinessjournal.com/Articles/2024/10/07/facilities.

project cost, suggesting that the actual cost of the stadium would be higher than what RVA Diamond Partners had been maintaining.  On information and belief, RVA Diamond Partners' slow progress resulted from its failure to properly fund the development effort.

33.    Given these shortcomings and delays, by 2023, DiBella was rightly concerned that RVA Diamond Partners would not deliver the new stadium on time.  If that occurred, DiBella and the City were at risk of losing the Squirrels—a hugely successful and lucrative franchise currently estimated to be one of the most valuable in Minor League Baseball.

34.    It would later become clear why RVA Diamond Partners was dragging its feet on the stadium project.  In early 2023, around the time the Richmond City Council approved a development agreement with RVA Diamond Partners,[6] the partnership started to fall apart. Republic left the development group in May 2023, and it sued Thalhimer and Loop Capital in July 2024[7] seeking $40 million and alleging that Loop Capital and Thalhimer formed a new group—Diamond District Partners, LLC—that cut out Republic.[8]

35.    The City represented in an April 2024 presentation providing an update on the Diamond District that "[t]he development team has changed from RVA Diamond Partners LLC

---

[6] Katherine Schulte, *Thalhimer Now Sole Principal for Diamond District Redevelopment*, Virginia Bus. (Nov. 1, 2024), https://virginiabusiness.com/thalhimer-now-sole-principal-for-diamond-district-redevelopment.

[7] *See* Compl., *Republic Projects, LLC v. Thalhimer Realty Partners, Inc.*, No. CL24-3076 (Va. Cir. Ct. July 18, 2024); *see also* Mem. in Supp. of Dem., at 1, *Republic Projects, LLC v. Thalhimer Realty Partners, Inc.*, No. CL24-3076 (Va. Cir. Ct. Nov. 18, 2024) (noting that Republic "pulled out of the project in May of 2023").

[8] Jonathan Spiers, *Loop Capital Wants Out of $40M Diamond District Lawsuit; Thalhimer Says Republic Has 'Quitter's Remorse,'* GORVA (Nov. 22, 2024), https://www.gorva.com/blog/Loop-Capital-wants-out-of--40M-Diamond-District-lawsuit--Thalhimer-says-Republic-has--quitter-s-remorse-.

composed of Thalhimer Realty Partner, Loop Capital[, and] Republic [t]o Diamond District Partners LLC [composed of] Thalhimer Realty Partner [and] Loop Capital."[9]

36.     But Loop Capital later revealed in legal filings that it never even signed the partnership agreement with Republic and Thalhimer in the first place.[10]  According to Loop Capital's attorney, "[a]lthough Loop had discussions with the city, Thalhimer and Republic about participating in the Diamond District development project, Loop never signed onto the project and currently is not involved in any capacity. ... Loop engaged in discussions with Thalhimer and the city through April/May 2024 regarding participation in the real estate development project but did not sign onto the development agreement in May 2024."[11]  Thalhimer confirmed that "Loop is not affiliated with Diamond District Partners LLC."[12]

37.     In other words, RVA Diamond Partners lied when it represented to the City of Richmond and others that it had formed a development group with Thalhimer, Republic, and Loop Capital capable of financing and spearheading development of the Diamond District.  It made material misrepresentations that it could fund the Diamond District's first phase of development—which required a $627.6 million minimum investment—to win the bidding process.[13]  But in reality, it never finalized any agreement with Loop Capital.  And Republic left the group shortly

---

[9] City of Richmond, *Development Updates 2024: Diamond District*, at 5 (Apr. 8, 2024), https://rva.gov/sites/default/files/2024-04/Diamond%20District%20updated%20presentation.pdf (cleaned up).

[10] *See* Loop Defs.' Dem. to Compl., at 2, *Republic Projects, LLC v. Thalhimer Realty Partners, Inc.*, No. CL24-3076 (Va. Cir. Ct. Nov. 15, 2024).

[11] *See* Katherine Schulte, *Thalhimer Now Sole Principal for Diamond District Redevelopment*.

[12] *Id.*

[13] *See* Richmond City Council, Diamond Dist. Finance Pres., at 24 (Sept. 15, 2022), *available at* https://richmondva.legistar.com/LegislationDetail.aspx?ID=5838106&GUID=213E8CB0-E648-47E3-A403-AC2CDB0F3FCD&Options=&Search=.

after RVA Diamond Partners was selected.  On information and belief, Republic was the most well capitalized member of RVA Diamond Partners and the primary money partner.

38.     Thalhimer, the City, and the EDA continued to lie—to DiBella, the MLB, and the people of Richmond—even after RVA Diamond Partners fell apart because they could not go through a lengthy, public solicitation process again and still meet the deadlines imposed by MLB to open a new stadium in Richmond.  Instead, they hid the facts that Republic had left the group and that Loop Capital was never actually part of it.

39.     Disagreements between the City, the EDA, and RVA Diamond Partners over the stadium persisted, and eventually MLB was forced to intervene.  In September 2023, Peter Woodfork, Senior Vice President of Minor League Operations and Development for MLB, convened a meeting at MLB's offices in New York with Richmond City officials; Guillot and other consultants and representatives; Chris Brumm (MLB's Senior Vice President & Head Counsel, Corporate and Finance); Morgan Sword (MLB's Executive Vice President for Baseball Operations); and DiBella, Botel, and David Carlock (the head of Machete Group).

40.     No one from the City, the EDA, or RVA Diamond Partners told MLB or the Squirrels that RVA Diamond Partners was a sham.[14]  By the time of the meeting, Republic had already quietly left the group.  And Thalhimer knew that Loop Capital never signed the partnership agreement in the first place.  Yet Thalhimer concealed this information and let MLB and the Squirrels believe that the original partnership remained in place.

---

[14] Diamond District Partners, LLC was formed in January 2024, with Guillot as its managing member, to disguise the fact that Thalhimer was the only remaining member of the development group awarded the contract to develop the Diamond District.  On January 8, 2024, Guillot met with one of the Squirrels' biggest investors, Brian Callahan, and asked Callahan to invest $4 million in Diamond District Partners, LLC.  Callhan refused.  When Callahan told DiBella about Guillot's request, it confirmed for DiBella that RVA Diamond Partners had lied about the nature of its partnership and state of its finances to win the Diamond District contract.

41. At the meeting, it became clear that RVA Diamond Partners (which unbeknownst to DiBella, the Squirrels, and MLB at the time was really just Thalhimer) and the City were not prepared to suffer overages to build the stadium and lacked the knowledge, experience, and expertise to deliver the type of stadium the Squirrels needed.

42. During a sidebar discussion with Woodfork, Carlock, and Botel, DiBella—concerned that the stadium deal would fall apart completely—suggested that the Squirrels ownership group could raise the additional money and build the stadium itself. DiBella and his partners knew what the Squirrels needed far better than RVA Diamond Partners.

43. Woodfork supported DiBella's proposal. He told RVA Diamond Partners, the City, and the EDA that they were not in a position to deliver the stadium on time and would not hit the deadlines imposed by MLB. DiBella's proposal to have the Squirrels design, construct, and cover cost overruns for the new stadium, if Richmond would provide the funding it initially pledged to help RVA Diamond Partners build the stadium, offered an attractive alternative that would allow the Squirrels to meet the MLB's deadlines and keep the team in Richmond. Ultimately, the City, the EDA, and RVA Diamond Partners (which only consisted of Thalhimer at that point) agreed.

44. The City and the EDA carved out a portion of the Diamond District, which was given to the Squirrels to build the stadium. Notably, the City and the EDA withheld from the Squirrels a 0.8-acre parcel of land adjacent to the planned entrance to the new stadium. The Squirrels objected but the City, the City Council members who selected RVA Diamond Partners, and the EDA said the 0.8-acre parcel was not available to the Squirrels because it was earmarked for an "African American-owned food court" that would be non-competitive with the Squirrels'

concessions and was needed to satisfy the requirement that 40% of the Diamond District be reserved for minority business enterprises.[15]

45.     DiBella and the Squirrels made multiple offers to buy or lease the parcel—both at fair-market and above-market prices—but Thalhimer rejected those offers.  On information and belief, Guillot and Thalhimer viewed the parcel as leverage with DiBella and the Squirrels and refused to sell it to retaliate against DiBella and the Squirrels for taking over the stadium project.  The City and the EDA were aware that DiBella and the Squirrels believed Thalhimer and Guillot were using this parcel to exert pressure.

46.     Machete Group broke ground on the new stadium—which would later be named CarMax Park—in early September 2024.  Ultimately, DiBella's ownership group would have to spend between $15 and $20 million of their own money to deliver a stadium consistent with other recently delivered, first-class Minor League Baseball stadiums in compliance with MLB requirements and able to generate enough baseball and non-baseball revenue to sustain the Squirrels' annual rent of over $3 million, which on information and belief is the highest paid by any Minor League team.

47.     The stadium was completed in 2026, and the Squirrels played (and won) their first game there on April 7, 2026.  Despite DiBella's success in designing, developing, and building the stadium, disputes persisted between DiBella and the Squirrels on the one hand and the City, the EDA, Guillot, and Thalhimer on the other.

---

[15] Richmond EDA Press Release, *City of Richmond Provides Update on Diamond District* (May 8, 2023), https://richmondeda.com/news-resource/diamond-district-moves-forward.

***DiBella and Guillot get into a heated conversation
during opening night for the Squirrels' new stadium.***

48.     On April 7, 2026, CarMax Park officially opened for the Squirrels' first home game of the season.  DiBella and Squirrels' co-owner Larry Botel attended the game.  So did Guillot and others from Thalhimer and the EDA.

49.     In the weeks prior to opening night, Botel and Guillot had been in communication regarding the 0.8-acre parcel adjacent to CarMax Park.  Although City officials and the EDA initially represented to DiBella and the Squirrels that the parcel would be used for an African American-owned food court that would be non-competitive with the Squirrels' concessions, Botel heard rumors that Thalhimer intended to lease the land to a sports-and-entertainment bar that would directly compete with the Squirrels.

50.     Specifically, DiBella, Botel, and the Squirrels heard from a former Squirrels executive, Todd Parnell, that Thalhimer had conversations with Parnell about naming a sports bar after him somewhere in the Diamond District.  Parnell learned from a Thalhimer-affiliated broker shortly before opening day that Thalhimer planned to put the sports bar named after Parnell on the 0.8-acre parcel.  Parnell—who did not want the bar named after him to compete with the Squirrels—immediately informed DiBella and Botel of Thalhimer's plan.

51.     The Squirrels had their real estate broker contact Thalhimer's broker to inquire again whether Thalhimer would sell the parcel to the Squirrels.  Thalhimer's broker refused to

14

discuss selling the parcel and confirmed to the Squirrels' broker that Thalhimer was close to finalizing a deal for a 15,000-square-foot sports bar.[16]

52.     Around the same time, Guillot stopped responding to Botel's communications about the parcel, so when Botel realized Guillot was at the game on opening night, Botel sought out Guillot to speak with him.  Botel found Guillot in the hallway near the Squirrels' suite and the team's offices at the stadium.  As Botel and Guillot were talking, DiBella came over and joined the conversation.

53.     No one else was nearby during this discussion except a security guard standing in front of the Squirrels' offices.

54.     DiBella began discussing the Diamond District development project, generally.  He noted his concerns that Thalhimer and the City were not living up to their promises to develop the remaining land in a timely fashion.  CarMax Park was the only finished piece of the Diamond District development project.  No other project within the 67 acres had been started, let alone finished.  And it was bad for the Squirrels' business to have their new park surrounded by nothing but a construction site.  DiBella did not specifically mention the 0.8-acre parcel of land that was a source of tension between the Squirrels and Thalhimer and Guillot.

55.     DiBella told Guillot, however, that he was frustrated with Guillot and Thalhimer, and he believed they lied to the City during the bidding process for the contract to develop the Diamond District and after.  DiBella said he felt obligated to expose the truth about the bidding process and Thalhimer's fraud, and he would hire lawyers if necessary to protect his business.

---

[16] On May 22, 2026, it was publicly announced that EAT Restaurant Partners signed a lease to put an approximately 5,000 square foot sports bar on the parcel adjacent to CarMax Park.  *See* Meredith Lindemon, *EAT Restaurant Partners planning Diamond District sports bar*, Richmond Times-Dispatch (May 22, 2026), https://richmond.com/life-entertainment/local/food-drink/article_37dfe296-eea2-49a0-9ee0-4429989f9850.html.

56.     DiBella also said that Guillot lied during the September 2023 meeting with MLB, and DiBella knew Guillot was now trying to compete with the Squirrels on the team's front lawn. DiBella said he thought the parcel could never be used to compete with the Squirrels because of representations the City and the EDA made that it would be used for a non-competitive food court, and DiBella believed the footprint for the Squirrels' stadium was carved out under false pretenses.

57.     Guillot remained quiet for most of the conversation.   Then, without warning, Guillot suddenly turned to DiBella and said, "You know everybody hates you right?   The City hates you!  I hate you!"

58.     DiBella was trying to discuss legitimate grievances with Guillot, and Guillot responded with petty insults.  He continued in a diatribe against DiBella, raising his voice and asserting that, as the developer, he could always do whatever he wanted with the 0.8-acre parcel, and there was never any false pretense in the representation that the 0.8-acre parcel would be non-competitive.  The conversation was heated.  And after a few minutes, DiBella said that he was not going to talk to Guillot anymore and turned to leave.  Guillot appeared to be intoxicated, and DiBella wanted to go before tensions escalated further.

59.     As DiBella was leaving, Guillot called out unprompted: "What are you going to hit me?"  DiBella responded unequivocally that he would never hit Guillot.  He said, "Of course not, I would *never* do that."   DiBella then said an approximate quote from one of his favorite movies, the 1982 film *Diner*, featuring Mickey Rourke and Kevin Bacon.  He said, "But if I did hit you, I'd hit you so hard, I'd hurt your whole family."  After that, DiBella returned to his suite.

60.     DiBella intended this as a joke.  It was not meant as an actual or serious threat.  And no reasonable person could have perceived it as such.

16

61.     According to Botel, the only participant in the conversation other than DiBella and Guillot, Guillot did not appear frightened or threatened by DiBella's comment.  Throughout the entire discussion, Guillot never moved, flinched, or did anything to indicate that he felt threatened by or afraid of DiBella.  Botel also did not perceive DiBella's words to be a threat.

62.     Moreover, Guillot has attended several Squirrels games with members of his family since this conversation with DiBella and Botel, including the game on April 9—just two days later. If he felt threatened or had any concern for his safety, Guillot would have reported DiBella to law enforcement and stopped bringing his family to the stadium.  Instead, he reported DiBella to Angie Rodgers, the Director of Economic Development at the EDA—a City official with no authority to investigate alleged criminal activity but with substantial influence over DiBella and Guillot's business dealings—further underscoring Guillot's intent to harm DiBella's reputation to gain a commercial advantage.

### *Guillot defames DiBella to Angie Rodgers and others, and Rodgers repeats Guillot's false claim to pressure DiBella and gain concessions from the Squirrels.*

63.     On April 9, 2026, Rodgers called DiBella and conveyed to him that she had heard "a serious allegation" about DiBella.

64.     During this April 9 call, Rodgers said to DiBella that Guillot told her directly that DiBella "***threatened to kill Guillot and his family*** if Guillot did not sell DiBella the 0.8-acre parcel."  In other words, Guillot falsely and brazenly told the head of economic development at the EDA—the primary City official overseeing the Diamond District project—that DiBella had tried to extort Guillot with threats of physical violence.

65.     What's worse, Guillot acted with actual malice because he knew this claim was false when he made it.  Guillot was present for—along with DiBella and Botel—and was a participant in the heated discussion on opening night during which Guillot claims DiBella

17

threatened and extorted him. Thus, he knew for a fact before he made his false claim to Rodgers that DiBella never threatened him or his family, and DiBella did not try to obtain the 0.8-acre parcel through threats of violence. Yet Guillot made this false accusation to Rodgers anyway.

66. Guillot's motive is clear. He wants to: (1) tarnish DiBella's sterling reputation for integrity and harm DiBella's good name in the eyes of City officials overseeing the Diamond District; (2) gain leverage in Thalhimer's ongoing commercial disputes with DiBella and the Squirrels; and (3) retaliate against DiBella for threatening to expose material misrepresentations Guillot and Thalhimer made during the Diamond District bidding process and after.

### *Rodgers links Guillot's false claim to ongoing commercial negotiations with DiBella.*

67. The call DiBella received from Rodgers on April 9 was the first time DiBella learned that Guillot had lied about what DiBella said to Guillot during opening night. On information and belief, Guillot repeated this false claim to others too.

68. DiBella never threatened to harm Guillot or his family. Nor did DiBella ever try to extort Guillot to obtain the 0.8-acre parcel adjacent to CarMax Park. To the contrary, DiBella was crystal clear that he would *never* hit Guillot.

69. In response to Rodgers repeating Guillot's false accusation, DiBella became upset. He emphatically explained that Guillot was *lying*, and he urged Rodgers to speak to Botel, who could corroborate that DiBella never threatened or extorted Guillot. Then DiBella hung up.

70. Rodgers texted DiBella that he was "[c]ompletely inappropriate," and she wanted to talk to him because she was "trying to say something to you that I really don't want to put in email." DiBella again made clear that Guillot's accusation was "completely fictional" and "unfounded." DiBella reiterated that Botel was "there for the entire conversation." This April 9 text exchange between DiBella and Rodgers is below, with DiBella's texts in blue and Rodgers's texts in gray:




71.    Shortly after Rodgers' call with DiBella on April 9, she spoke with Botel.  Botel told her expressly that Guillot's claim was not true.  Botel explained to Rodgers that DiBella never threatened Guillot.  And DiBella certainly did not threaten to kill Guillot and his whole family if Guillot did not sell DiBella the 0.8-acre parcel of land.

72.    According to Botel, Rodgers then turned the conversation to the broader situation relating to the Diamond District.  Rodgers said that her goal is to get the City to be able to do the infrastructure work for the Diamond District, which is being blocked by the fact that Virginia

19

Commonwealth University needs to first sell Sports Backers Stadium—where VCU's soccer and other teams used to play—to the City.

73.     Sports Backers is currently owned by VCU.  The City of Richmond agreed to pay $25 million to VCU to purchase Sports Backers because the City needs the land for infrastructure for the Diamond District.  The City also agreed to transfer the remaining property to Diamond District Partners, LLC (effectively, Thalhimer) for a fraction of what the City paid to acquire the land.  VCU has refused to close on the sale of Sports Backers to the City because the City has not provided VCU with adequate assurances that VCU's baseball team will be allowed to play at CarMax Park.

74.     After this call with Botel, Rodgers spoke to DiBella again.  Rodgers did not apologize for repeating Guillot's accusation, which she now knew was false.  DiBella said he was shocked that Rodgers would discuss business with Botel after leveling such a serious accusation. Rodgers replied that she and Botel were simply being professional and DiBella should be too.

75.     She then raised the issue of VCU being allowed to play at CarMax Park, connecting that issue to the need for infrastructure to commence on land currently occupied by Sports Backers and owned by VCU for the benefit of CarMax Park and the Diamond District.  DiBella saw Rodgers as using Guillot's false accusation to pressure DiBella to enter into an operating agreement with VCU that would require the Squirrels to maintain the field and stadium for VCU's use.  This agreement would have the domino effect of allowing VCU to sell Sports Backers Stadium to the City, unlocking the ongoing development gridlock.

76.     VCU's use of CarMax Park was an ongoing point of negotiation between DiBella, Thalhimer, and the City—along with negotiations over the 0.8-acre parcel—and DiBella could not

20

believe that Rodgers would raise this contentious issue immediately after she brought up Guillot's false allegation that DiBella tried to extort him.

77.     DiBella and the Squirrels have no obligation to maintain the field and stadium and share MLB-used spaces with VCU, and DiBella has been clear that he currently does not intend to do so.  That's why Rodgers used Guillot's false allegation that DiBella engaged in criminal conduct to pressure DiBella to let VCU use CarMax Park.  On information and belief, Rodgers, Guillot, and Thalhimer thought that Guillot's false accusation provided a pressure point that the EDA and Thalhimer could use as leverage against DiBella in their ongoing business dealings.

### *Guillot's false and defamatory statement has harmed DiBella's reputation.*

78.     As head of the EDA, Rodgers essentially functions as DiBella's landlord and business partner.  The Squirrels signed a 30-year lease on CarMax Park with the City.  Guillot's false and defamatory claim that DiBella tried to extort him and threatened to kill him and his family had—and continues to have—serious consequences for DiBella's business and reputation.

79.     Not only is extortion a felony under Virginia law and a federal crime,[17] such accusations about DiBella could expose DiBella to severe penalties pursuant to the Squirrels' license agreement with MLB.  That agreement grants the Commissioner of Baseball "the definitive and independent authority" to "investigate any act, omission, transaction, or practice charged, alleged, or suspected to be in violation of this Agreement or any other MLB PDL Rules and

---

[17] *See* Va. Code § 18.2-59 ("Any person who ... threatens injury to the character, person, or property of another person ... and thereby extorts money, property, or pecuniary benefit ... is guilty of a Class 5 felony."); *Dimaio v. Commonwealth*, 621 S.E.2d 696, 767-68 (Va. Ct. App. 2005) (upholding felony conviction for attempted extortion); *see also* 18 U.S.C. § 1951 (outlawing attempted extortion that affects interstate commerce); *United States v. Bengali*, 11 F.3d 1207, 1208-09 (4th Cir. 1993) (upholding attempted extortion conviction under the Hobbs Act).

Regulations or to not be in the best interests of baseball" and to "determine after investigation what preventative, remedial, or punitive action is appropriate and to take such action."

80. Such punitive action could include suspensions or fines against DiBella and the Squirrels' ownership group. The Commissioner could even decide to oust DiBella, take away his status as managing member of Navigators Baseball, or revoke Navigators Baseball's license.

81. Beyond this, DiBella prides himself on always acting with integrity, and he has prioritized integrity in all his business dealings—as evidenced by the fact that DiBella is the only boxing promoter to ever win the BWAA's award for integrity and honesty. Guillot's false statement to Rodgers accused DiBella of unethical and dishonest criminal conduct that seriously harmed his hard-earned reputation for integrity.

82. On information and belief based on Rodgers's comments to DiBella during his April 9 communications with her, Guillot's allegation hurt DiBella's professional reputation in the eyes of Rodgers—the head of the agency overseeing a massive development project with substantial economic ramifications for DiBella and the Squirrels—and others.

83. Moreover, the repetition of this false claim by Rodgers or Guillot to other City officials, business leaders, or anyone else would amplify the harm to DiBella exponentially.

84. DiBella was shocked, angered, and confused to learn from Rodgers of Guillot's false accusation that DiBella engaged in dishonest, criminal conduct (i.e., extortion). And DiBella cannot let such a brazen attack on his integrity and character go uncorrected. He therefore brings this lawsuit to vindicate his reputation and protect his business interests.

22

## CLAIM

### COUNT ONE
### DEFAMATION PER SE
*(Against All Defendants)*

85.     DiBella repeats, re-alleges, and incorporates by reference the foregoing paragraphs as if set forth fully herein.

86.     Sometime between April 7, 2026, and April 9, 2026, Defendant Jason Guillot published the following false and defamatory statement concerning DiBella: that ***DiBella threatened to kill Guillot and his entire family if Guillot would not sell him a 0.8-acre parcel that DiBella and the Squirrels had been trying to acquire from Thalhimer and Guillot***.

87.     Guillot published this false and defamatory statement in Virginia by conveying it orally, and possibly in writing, to at least one third party, Angie Rodgers.  On information and belief, Guillot also published this defamatory claim to others, as discovery is expected to reveal.

88.     Guillot's statement is of and concerning DiBella—it identifies DiBella expressly by name and refers to DiBella's actions.  Moreover, Rodgers clearly understood the statement to be of and concerning DiBella because she contacted DiBella shortly after Guillot made the false and defamatory statement to her.

89.     Guillot's statement is a false statement of fact and is reasonably understood as such. Specifically, whether DiBella threatened to kill Guillot and his family if Guillot did not sell the 0.8-acre parcel to DiBella is reasonably susceptible of being proved true or false.  And it is demonstrably false.  DiBella never threatened Guillot or his family, and he certainly never sought to obtain the 0.8-acre parcel through threats of violence against Guillot and his family.

90.     Guillot's statement is defamatory.  It tends to, and did, expose DiBella to hatred, ridicule, or contempt in the minds of a considerable and respectable segment in the community, tends to impair his standing in the community, tends to lower the esteem in which he is held, and

tends to discourage others from associating with him, including by accusing him of a serious felony and federal crime (i.e., of using threats of physical violence to extort property). Rodgers understood Guillot's statement to be defamatory as evidenced by the fact that she quickly called DiBella and told him that she had heard a "serious allegation" about him.

91.     Guillot's statement is also defamatory *per se* because it accuses DiBella of extortion—a serious crime of moral turpitude. It is also defamatory *per se* because it tends to harm DiBella in his profession. It attributes to him unfitness to perform the duties of his profession (as a boxing promoter and a Minor League team owner) and foreseeably hurt DiBella in his profession. This defamatory meaning is also apparent on the face of Guillot's statement, without the need of extrinsic evidence. DiBella is therefore entitled to presumed damages.

92.     Guillot knew of the substantial danger of injury to DiBella and DiBella's reputation from Guillot's false statement. He published his false statement to Rodgers—a government official with authority over the Diamond District project and Guillot and Thalhimer's business dealings—expressly to harm DiBella's standing with a key government regulator and for his own and Thalhimer's benefit.

93.     Guillot published the statement to Rodgers with actual malice. He had subjective awareness of its falsity. Guillot was **present** during and was **a participant in** the April 7, 2026 conversation with DiBella and therefore was fully aware that DiBella did not threaten to kill Guillot or his family if Guillot did not sell DiBella the parcel.

94.     At a minimum, Guillot acted with reckless disregard for the truth of his statement, as evidenced by the facts that Guillot: (1) personally resented DiBella, as Guillot himself admitted; (2) leveraged that animus and the false accusation he made about DiBella to gain concessions from

24

DiBella and the Squirrels to advance Thalhimer's negotiating position; and (3) wanted to retaliate against DiBella for threatening to expose Guillot and Thalhimer's fraud.

95.    Guillot had no applicable privilege or legal authorization to publish the defamatory statement to Rodgers and others, or, if he did, he abused that privilege.  Guillot published his defamatory statement in bad faith, with actual malice, and with common law express malice such that any otherwise potentially applicable privilege is vitiated and cannot apply.

96.    Guillot published this statement while acting within the scope of his employment at Thalhimer and in furtherance of Thalhimer's business, including by leading Thalhimer's Diamond District development team and coordinating with the City and the EDA.

97.    Because Guillot published this false and defamatory statement to Rodgers in his role as lead of Thalhimer's Diamond District development team and within the context of the ongoing negotiations among the parties about the Diamond District, Guillot's defamatory act was naturally incident to Thalhimer's business, expressly or impliedly directed by Thalhimer, and done with the apparent authority and agency of Thalhimer.

98.    Moreover, Guillot was acting within the scope of his role as a principal for Thalhimer and was engaged in services for Thalhimer when he published the statement—he was liaising with the EDA about the Diamond District project.

99.    Guillot published the statement to further Thalhimer's interests, leveraging it to gain advantage in Thalhimer's ongoing negotiations with DiBella, the Squirrels, and the City over the Diamond District project.  Thalhimer is subject to liability for Guillot's defamatory statement.

100.    Defendants' actions were malicious, willful, and wanton, and evidence a conscious disregard for DiBella's rights.  Accordingly, punitive damages are appropriate.

25

101. As a direct and proximate result of Guillot's defamatory statement to Rodgers, DiBella has suffered substantial economic, reputational, and other damage, as well as embarrassment, humiliation, and emotional distress.

102. In view of the foregoing, DiBella is entitled to actual, presumed, and punitive damages in amounts to be specifically determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lou DiBella respectfully requests that the Court enter judgment in his favor and against Defendants Jason Guillot and Thalhimer Realty Partners, Inc. as follows:

(1) Awarding DiBella actual, presumed, and punitive damages of tens of millions of dollars in amounts to be specifically determined at trial;

(2) Awarding DiBella all reasonable expenses authorized by law, including but not limited to reasonable attorneys' fees, incurred to mitigate the harm caused by Defendants' defamation and tortious conduct;

(3) Awarding DiBella all reasonable costs and attorneys' fees authorized by law spent in bringing this action to vindicate his reputation and good name;

(4) Awarding DiBella all costs, disbursements, fees, and pre- and post-judgment interest as authorized by law;

(5) Issuing a narrowly tailored injunction to prohibit Guillot and Thalhimer from repeating or republishing the false claim that DiBella threatened to kill Guillot and his family if Guillot did not sell DiBella the 0.8-acre parcel; and

(6) Awarding DiBella such other and additional relief and remedies as the Court may deem just and proper.

## JURY DEMAND

Plaintiff Lou DiBella demands a jury on all claims and issues triable by way of jury.

Dated: May 28, 2026                    Respectfully Submitted,

                                       /s/ Nicholas J. Brechbill
                                       Nicholas J. Brechbill (VSB No. 99822)
                                       Carolyn M. Wesnousky (*pro hac vice* forthcoming)
                                       CLARE LOCKE LLP
                                       10 Prince Street
                                       Alexandria, VA 22314
                                       Tel: (202) 628-7400
                                       Fax: (202) 478-0475
                                       nick@clarelocke.com
                                       carrie@clarelocke.com

                                       *Attorneys for Plaintiff Lou DiBella*