**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| LOU DIBELLA,<br><br>*Plaintiff*,<br><br>v.<br><br>JASON GUILLOT and<br>THALHIMER REALTY PARTNERS, INC.,<br><br>*Defendants*. | Civil Action No. 3:26-cv-00486-DJN<br><br>JURY TRIAL DEMANDED |

## SECOND AMENDED COMPLAINT

Plaintiff Lou DiBella in support of his Second Amended Complaint against Defendants Jason Guillot and Thalhimer Realty Partners, Inc. states as follows:

## NATURE OF THE ACTION

1. This action is a straightforward case of defamation. It arises from Defendants' knowingly false and defamatory statements to Richmond City officials and others accusing Plaintiff Lou DiBella of extortion. On April 7, 2026, Jason Guillot—a Principal at Thalhimer Realty Partners, Inc.—texted Angie Rodgers—the Director of Economic Development for Richmond's Economic Development Authority ("EDA")—that DiBella "just threatened [Guillot] and [his] family" and "threatened to 'bitch slap [Guillot]' because" Guillot would not sell DiBella a certain parcel of land.

2. The next day, April 8, 2026, Defendants sent a memo to Richmond City officials, including Mayor Danny Avula, stating that DiBella threatened to "do everything in his power" to put Guillot and Thalhimer's development company, Diamond District Partners, "out of business" if Guillot did not "relinquish control of [the] parcel of land." According to Defendants' memo,

DiBella also threatened to "come after" Guillot and his family "with everything he has," if Diamond District Partners tried to develop the parcel itself.

3. On information and belief, Defendants sent the memo to City officials because they knew it would be released to the media through Freedom of Information Act ("FOIA") public records requests. The media regularly submits FOIA requests for public records relating to the Diamond District—a proposed $2.4 billion mixed-use development project in the heart of Richmond being developed by the City and Diamond District Partners.

4. On information and belief, Defendants told one or more reporters about the memo, that the City had it, and that the reporters could FOIA it long before DiBella knew it existed. Defendants were also working with at least one reporter—Richmond BizSense reporter Jonathan Spiers—who told DiBella's public relations representative that Spiers started reporting for an article about the April 7, 2026 conversation between DiBella and Guillot ***before*** DiBella filed his original Complaint on May 28, 2026.

5. On information and belief, the day after DiBella filed his Complaint, a reporter—most likely Spiers—submitted a FOIA request to the City specifically requesting Defendants' memo. DiBella's Complaint did not say anything about the memo (because DiBella did not know at the time that it existed). On information and belief, the requestor learned about the memo from Defendants, who told him that he could obtain it from the City through a FOIA request. The City produced the memo in response to this request ***the same day***.

> **Request #FOIA-2026-83**
> *I am requesting a copy of a memo sent to city officials including EDA Director Angie Rodgers and Mayor Danny Avula from Jason Guillot with Thalhimer Realty Partners/Diamond District Partners regarding an incident involving Lou DiBella at CarMax Park on April 7, 2026. Thanks for your assistance. Completion Date: 2026-05-29 Department(s) Responsible for Fulfilling Request: Office of the Mayor, Office of Strategic Communications Fees or Cost Assigned for Fulfilling Request: $0*

6. As a natural, probable, and intended consequence of Defendants' publication of the memo to the City—and subsequent leak to the media—multiple media outlets published stories online to countless readers and a global internet audience repeating Guillot's defamatory statements, which falsely accuse DiBella of trying to extort the parcel from Guillot. Those articles and defamatory statements remain online and most likely always will.

7. Defendants' statements are false, and Defendants knew they were false when they made them. Guillot claimed that DiBella made these threats directly to him during a conversation they had with Larry Botel—DiBella's business partner—on April 7, 2026, during opening night of a new baseball stadium for the AA Minor League Baseball team, the Richmond Flying Squirrels.

8. As one of three participants in this conversation, Guillot knew that DiBella did not threaten Guillot's life or his family if Guillot refused to sell DiBella the parcel. Guillot knew that DiBella did not threaten to do everything in his power to put Diamond District Partners out of business if it refused to sell DiBella the parcel. And Guillot knew DiBella did not threaten to come after Guillot and his family with everything he has if Diamond District Partners developed the parcel. In fact, Guillot knew that DiBella did not specifically bring up obtaining the parcel at all.

9. DiBella is the managing partner of Navigators Baseball LP—the limited partnership that owns the Squirrels. Botel is another partner. They and the team have been locked in contentious business dealings with Defendants, the City of Richmond, and the EDA for years over the Squirrels' new stadium, which is the flagship property in the Diamond District.

10. The contract to develop the Diamond District was initially awarded in 2022 to RVA Diamond Partners LLC, a group made up of Thalhimer Realty Partners, Inc. (Guillot's company) and two other firms. RVA Diamond Partners fell apart shortly after winning the contract, leaving Guillot and Thalhimer to spearhead development of the Diamond District with the City and EDA.

11. Defendants' motive for making these false and defamatory statements to Rodgers, the Mayor, and other City officials—and leaking the memo to the media—is clear: they hoped to bias Rodgers, the Mayor, the City, and the public against DiBella and create leverage for Thalhimer and the EDA in their business dealings with DiBella and the Squirrels. Defendants also sought to retaliate against DiBella for accusing them and RVA Diamond Partners of making material misrepresentations to win the Diamond District contract and after, including during a meeting with Major League Baseball ("MLB") in September 2023.

12. Rather than compete fairly and negotiate with DiBella in good faith to resolve their disputes, Defendants defamed DiBella's good name and hard-earned reputation to gain the upper hand in their business dealings. DiBella brings this action to vindicate his reputation and hold Defendants accountable for knowingly lying to City officials and others by falsely accusing DiBella of criminal conduct and spreading those lies as widely as possible to taint DiBella's reputation among the general public.

## PARTIES AND RELEVANT NON-PARTIES

13. Plaintiff Lou DiBella is a citizen of the State of New York and the United States who resides and is domiciled in New York. He is a boxing promoter and entertainment producer. He is the president of DiBella Entertainment and the managing partner of Navigators Baseball LP, the limited partnership that owns the AA Minor League Baseball team, the Richmond Flying Squirrels. DiBella is the only partner with authority in dealings between the Squirrels and MLB.

14. Defendant Jason Guillot is a citizen of the Commonwealth of Virginia and the United States who resides and is domiciled in Virginia. He is a commercial real estate developer and a principal at Thalhimer Realty Partners, Inc.

15. Defendant Thalhimer Realty Partners, Inc. is a real estate development corporation that is incorporated under the laws of the Commonwealth of Virginia and has its principal place

of business at 11100 West Broad Street, Glen Allen, Virginia. Thalhimer invests in, develops, and manages commercial and residential real estate across Virginia and was part of the group awarded a contract to develop the Diamond District—a major mixed-use development project in the heart of Richmond. Thalhimer assigned Guillot to be its point person on the Diamond District project and in dealings with the City of Richmond and the EDA.

16. Non-party RVA Diamond Partners LLC was the development group to which the City of Richmond awarded the contract to develop the Diamond District in 2022. RVA Diamond Partners purported to be made up of Republic Projects LLC, Thalhimer, and Loop Capital Markets, LLC. However, in 2023, Republic left the group, and in subsequent legal filings, Loop Capital claimed it was never part of the group. Rather than resolicit bids when Republic left RVA Diamond Partners, the City kept Thalhimer—even though Thalhimer is ill-equipped to lead development of a project of the magnitude that was bid out—to avoid another lengthy, public solicitation and bidding process.

17. To disguise the fact that Thalhimer is now the only remaining member of the development group originally selected by the City, Thalhimer formed Diamond District Partners, LLC in January 2024 to take over development of the Diamond District when RVA Diamond Partners fell apart.

18. As a result, development of the Diamond District is far behind schedule. Phase 1—which was to include the Squirrels' new stadium along with housing, a hotel, and retail space—was initially scheduled for completion in 2026.[1] Only the Squirrels' stadium is complete.

[1] *See* Richmond City Council, Diamond Dist. Fin. Presentation, at 25 (Sept. 15, 2022), *available at* https://richmondva.legistar.com/LegislationDetail.aspx?ID=5838106&GUID=213E8CB0-E648-47E3-A403-AC2CDB0F3FCD&Options=&Search= (Phase 1a target completion date in 2025 and Phase 1b target completion date in 2026).

19. Non-party the Richmond Economic Development Authority ("EDA") is the primary Richmond government entity overseeing the Diamond District. It is DiBella and the Squirrels' main point of contact with the City concerning the stadium and the Diamond District. The EDA's mission is to "attract, retain, and support business in Richmond, Virginia."

20. Non-party Angie Rodgers is the Director of Economic Development at the EDA and has held that role since August 2025. She is now responsible for managing and overseeing Richmond's efforts to develop the Diamond District, even though she was not involved in the original planning or bid processes.

## JURISDICTION AND VENUE

21. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332 because there exists complete diversity of citizenship between DiBella, who is a citizen of New York, and Defendants, who are citizens of Virginia, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

22. This Court has general personal jurisdiction over Guillot because he is a citizen of and is domiciled in Virginia. This Court has general personal jurisdiction over Thalhimer because it is incorporated and has its principal place of business in Virginia.

23. Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to DiBella's defamation claim occurred in this District. Defendants published their defamatory statements in this District, and DiBella suffered damage from those statements here.

## FACTUAL ALLEGATIONS

### *Lou DiBella brings the Flying Squirrels baseball team to Richmond.*

24. Lou DiBella is a Brooklyn native and a graduate of Harvard Law School with a passion for sports, especially boxing and baseball. He served as the Vice President and Senior

Vice President in Charge of Programming at HBO Sports for over a decade, where he created and oversaw the highly successful series *Boxing After Dark* and *KO Nation*, before leaving in 2000 to start his own company, DiBella Entertainment. He has promoted numerous world-class boxing talents and worked tirelessly to bring boxing matches back to Brooklyn, a goal he realized in 2016.

25. Also in 2016, DiBella received the James A. Farley Award for Honesty and Integrity from the Boxing Writers Association of America ("BWAA"). This prestigious award "is not given to just anyone, or even given every year, candidates needing to keep their reputations unsullied for a long enough period to rise above the bull----."[2] On information and belief, DiBella is the only boxing promoter ever to have won this award.

26. In recognition of his many contributions to the sport, DiBella was inducted into the International Boxing Hall of Fame in 2020—his first year of eligibility.

27. DiBella is also an avid baseball fan. In 2005, DiBella (along with Navigators Baseball LP) purchased the Norwich Navigators—the AA Minor League Baseball team in Norwich, Connecticut affiliated with the San Francisco Giants.

28. In 2009, DiBella was instrumental in moving the team to Richmond, Virginia, expending substantial time, effort, and money to get buy-in from a wide array of stakeholders ranging from MLB to the mayor of Richmond, and more. The team was renamed the Richmond Flying Squirrels. Under DiBella's leadership, the Squirrels became one of the most beloved and successful franchises in Minor League Baseball, routinely topping attendance charts.[3]

---

[2] BWAA, *Lou DiBella Wins BWAA Farley Honesty & Integrity Award* (Jan. 20, 2016), https://www.bwaa.org/single-post/2016-1-20-lou-dibella-wins-bwaa-farley-honesty-integrity-award.

[3] *See* Brennan Long, *How The Richmond Flying Squirrels Become One Of The South's Most Beloved Baseball Teams*, Southern Living (Apr. 10, 2025), https://www.southernliving.com/richmond-flying-squirrels-11710903.

***The City of Richmond promises to build the Squirrels a new stadium.***

29. When the Squirrels first moved to Richmond, the team played in a run-down stadium known as the "Diamond." The Diamond is a 12,000-plus seat stadium that opened in 1985. The Diamond was (and is) also home to the Virginia Commonwealth University ("VCU") baseball team, the VCU Rams.

30. By 2009, the Diamond was almost 25 years old and well past its prime. It had only one elevator to bring fans from the lower to upper concourses, limited concession options, a roof that leaked on rainy days, virtually no accessibility for the disabled and elderly, and not enough infrastructure to serve the 9,000 seats available for Squirrels' gamedays.

31. As part of the agreement for DiBella to bring the Squirrels to Richmond, the City promised to build a new stadium for the Squirrels within three years. But the City failed to do so.

***Richmond plans to make the Squirrels' new stadium the centerpiece of a new $2.4 billion mixed-use development project called the Diamond District.***

32. For more than a decade, DiBella worked tirelessly to try to make the City's promise of a new stadium for the Squirrels a reality. In December 2021, it looked like DiBella might finally succeed. The City—under the auspices of the EDA—launched a public search for a private partner to lead a massive new $2.4 billion mixed-use development project called the Diamond District.

33. The Diamond District was imagined as a redevelopment of 67 acres in the heart of Richmond that would feature a new stadium for the Squirrels as its anchor property. Along with the new stadium, the Diamond District would include retail and office space, a hotel, multi-family residential units, and public parks.

34. The City's decision to embark on this development project and build the Squirrels a new stadium came just in time. Before the start of the 2021 baseball season, MLB took control of Minor League Baseball. MLB issued new mandatory facility standards for Minor League

stadiums. The stadium in which the Squirrels played at the time, the Diamond, did not meet MLB's standards, nor could it be renovated to meet such standards. So, if the Squirrels wanted to stay in Richmond, they needed a new stadium.

35. In September 2022, after a months-long solicitation and bid process, the EDA selected RVA Diamond Partners LLC—purportedly made up of (1) Republic, a national real estate investment, management, and development enterprise; (2) Thalhimer (of which Guillot is a principal); and (3) Loop Capital, a minority-owned investment bank, brokerage, and advisory firm—as the private development group to partner with the City to develop the Diamond District.[4]

36. Machete Group was runner up to RVA Diamond Partners in the City's bid selection process. Machete Group is an industry-leading real estate development and development management firm specializing in arenas, stadiums, entertainment venues, and adjacent mixed-use projects. Since its inception in 2017, the firm has overseen more than $5 billion of project scope including more than 20 sports venues.

37. Unlike Machete, RVA Diamond Partners had no experience developing sports venues.[5] From the initial, formal introduction between the City, RVA Diamond Partners, and the Squirrels, RVA Diamond Partners made it clear that it considered building the Squirrels' new stadium an act of philanthropy. Even though the new stadium was to be the cornerstone of the Diamond District, the principal of Republic described it as an albatross that they were only building because they were forced to. It was unsurprising, therefore, that RVA Diamond Partners appeared

---

[4] City of Richmond, *Development Updates 2024: Diamond District*, at 5 (Apr. 8, 2024), https://rva.gov/sites/default/files/2024-04/Diamond%20District%20updated%20presentation.pdf.

[5] Bret McCormick, *Facilities and Ticketing: A Critical Meeting at MLB's Office Helps Richmond, Flying Squirrels Complete 15-year Stadium Mission*, Sports Bus. J. (Oct. 7, 2024), https://www.sportsbusinessjournal.com/Articles/2024/10/07/facilities.

disinterested in or incapable of designing and overseeing construction of a top-notch, modern professional baseball stadium that would meet MLB requirements and satisfy the Squirrels' needs.

***DiBella and the Squirrels take over building the new stadium and pledge to spend tens of millions of dollars of their own money to make it a reality.***

38. Over the course of the next year, RVA Diamond Partners consistently failed to meet milestones to deliver the stadium on time. For several months, RVA Diamond Partners made limited progress on design drawings, sending the Squirrels and the team's ballpark consultants multiple mockups that were basic and unprofessional for a project of this magnitude. RVA Diamond Partners did not seek input from DiBella or the Squirrels regarding the new stadium, and its proposals did not reflect the Squirrels or MLB's needs.

39. RVA Diamond Partners also consistently failed to meet agreed deadlines with the City to close on portions of land, which had downstream impacts on infrastructure improvements associated with the stadium. And it waited several months to develop any kind of bottom-up project cost, suggesting that the actual cost of the stadium would be higher than what RVA Diamond Partners had been maintaining. On information and belief, RVA Diamond Partners' slow progress resulted from its failure to properly fund the development effort.

40. Given these shortcomings and delays, by 2023, DiBella was rightly concerned that RVA Diamond Partners would not deliver the new stadium on time. If that occurred, DiBella and the City were at risk of losing the Squirrels—a hugely successful and lucrative franchise currently estimated to be one of the most valuable in Minor League Baseball.

41. It would later become clear why RVA Diamond Partners was dragging its feet on the stadium project. In early 2023, around the time the Richmond City Council approved a

development agreement with RVA Diamond Partners,[6] the partnership started to fall apart. Republic left the development group in May 2023, and it sued Thalhimer and Loop Capital in July 2024[7] seeking $40 million and alleging that Loop Capital and Thalhimer formed a new group—Diamond District Partners, LLC—that cut out Republic.[8]

42. The City represented in an April 2024 presentation providing an update on the Diamond District that "[t]he development team has changed from RVA Diamond Partners LLC composed of Thalhimer Realty Partner[s], Loop Capital[, and] Republic [t]o Diamond District Partners LLC [composed of] Thalhimer Realty Partner [and] Loop Capital."[9]

43. But Loop Capital later revealed in legal filings that it never even signed the partnership agreement with Republic and Thalhimer in the first place.[10] According to Loop Capital's attorney, "[a]lthough Loop had discussions with the city, Thalhimer and Republic about participating in the Diamond District development project, Loop never signed onto the project and currently is not involved in any capacity. ... Loop engaged in discussions with Thalhimer and the

---

[6] Katherine Schulte, *Thalhimer Now Sole Principal for Diamond District Redevelopment*, Virginia Bus. (Nov. 1, 2024), https://virginiabusiness.com/thalhimer-now-sole-principal-for-diamond-district-redevelopment.

[7] *See* Compl., *Republic Projects, LLC v. Thalhimer Realty Partners, Inc.*, No. CL24-3076 (Va. Cir. Ct. July 18, 2024); *see also* Mem. in Supp. of Dem., at 1, *Republic Projects, LLC v. Thalhimer Realty Partners, Inc.*, No. CL24-3076 (Va. Cir. Ct. Nov. 18, 2024) (noting that Republic "pulled out of the project in May of 2023").

[8] Jonathan Spiers, *Loop Capital Wants Out of $40M Diamond District Lawsuit; Thalhimer Says Republic Has 'Quitter's Remorse,'* GORVA (Nov. 22, 2024), https://www.gorva.com/blog/Loop-Capital-wants-out-of--40M-Diamond-District-lawsuit--Thalhimer-says-Republic-has--quitter-s-remorse-.

[9] City of Richmond, *Development Updates 2024: Diamond District*, at 5 (Apr. 8, 2024), https://rva.gov/sites/default/files/2024-04/Diamond%20District%20updated%20presentation.pdf (cleaned up).

[10] *See* Loop Defs.' Dem. to Compl., at 2, *Republic Projects, LLC v. Thalhimer Realty Partners, Inc.*, No. CL24-3076 (Va. Cir. Ct. Nov. 15, 2024).

city through April/May 2024 regarding participation in the real estate development project but did not sign onto the development agreement in May 2024."[11] Thalhimer confirmed that "Loop is not affiliated with Diamond District Partners LLC."[12]

44. In other words, RVA Diamond Partners lied when it represented to the City of Richmond and others that it had formed a development group with Thalhimer, Republic, and Loop Capital capable of financing and spearheading development of the Diamond District. It made material misrepresentations that it could fund the Diamond District's first phase of development—which required a $627.6 million minimum investment—to win the bidding process.[13] But in reality, it never finalized any agreement with Loop Capital. And Republic left the group shortly after RVA Diamond Partners was selected. On information and belief, Republic was the most well capitalized member of RVA Diamond Partners and the primary money partner.

45. Thalhimer, the City, and the EDA continued to lie—to DiBella, the MLB, and the people of Richmond—even after RVA Diamond Partners fell apart because they could not go through a lengthy, public solicitation process again and still meet the deadlines imposed by MLB to open a new stadium in Richmond. Instead, they hid the facts that Loop Capital was never actually part of the group, Thalhimer was left to develop the Diamond District on its own, and it lacked adequate funding.

46. Disagreements between the City, the EDA, and RVA Diamond Partners over the stadium persisted, and eventually MLB was forced to intervene. In September 2023, Peter

---

[11] *See* Katherine Schulte, *Thalhimer Now Sole Principal for Diamond District Redevelopment*.

[12] *Id.*

[13] *See* Richmond City Council, Diamond Dist. Fin. Presentation, at 24 (Sept. 15, 2022), *available at* https://richmondva.legistar.com/LegislationDetail.aspx?ID=5838106&GUID=213E8CB0-E648-47E3-A403-AC2CDB0F3FCD&Options=&Search=.

Woodfork, Senior Vice President of Minor League Operations and Development for MLB, convened a meeting at MLB's offices in New York with Richmond City officials; Guillot and other consultants and representatives; Chris Brumm (MLB's Senior Vice President & Head Counsel, Corporate and Finance); Morgan Sword (MLB's Executive Vice President for Baseball Operations); and DiBella, Botel, and David Carlock (the head of Machete Group).

47. No one from the City, the EDA, or RVA Diamond Partners told MLB or the Squirrels that RVA Diamond Partners was a sham.[14] By the time of the meeting, Republic had already left the group.[15] And Defendants knew that Loop Capital never signed the agreement in the first place. The Squirrels, Machete, and DiBella had heard rumors that RVA Diamond Partners was not capitalized and that the group may indeed have broken up. When they asked about this at the meeting, Defendants represented that the group remained intact and was adequately funded—even though they knew that was not true.

48. During the meeting, it became clear that RVA Diamond Partners (which unbeknownst to DiBella, the Squirrels, and MLB at the time was really just Thalhimer) and the City were not prepared to suffer overages to build the stadium and lacked the knowledge, experience, and expertise to deliver the type of stadium the Squirrels needed.

---

[14] Diamond District Partners, LLC was formed in January 2024, with Guillot as its managing member, to disguise the fact that Thalhimer was the only remaining member of the development group awarded the contract to develop the Diamond District. On January 8, 2024, Guillot met with one of the Squirrels' biggest investors, Brian Callaghan, and asked Callaghan to invest $4 million in Diamond District Partners, LLC. Callaghan refused. During a text exchange on January 16, 2024, Callaghan asked Guillot "How's it looking with getting the capital?" to which Guillot replied, "Great, thanks. I'm making progress, but still have a ways to go." When Callaghan told DiBella about Guillot's request, it confirmed for DiBella that RVA Diamond Partners had lied about the nature of its partnership and state of its finances to win the Diamond District contract.

[15] Defendants admitted in the Answer they filed in response to DiBella's original complaint that "Republic left RVA Diamond Partners, LLC in or around May of 2023." (Defs.' Answer to Compl. ¶ 34, ECF No. 8.)

49. During a sidebar discussion with Woodfork, Carlock, and Botel, DiBella—concerned that the stadium deal would fall apart completely—suggested that the Squirrels ownership group could raise the additional money and build the stadium itself. DiBella and his partners knew what the Squirrels needed far better than RVA Diamond Partners. Defendants' false representations that the development group was still intact and had adequate funding was material to inducing DiBella and the Squirrels to offer to raise the additional money for the stadium.

50. Woodfork supported DiBella's proposal. He told RVA Diamond Partners, the City, and the EDA that they were not in a position to deliver the stadium on time and would not hit the deadlines imposed by MLB. DiBella's proposal to have the Squirrels design, construct, and cover cost overruns for the new stadium, if Richmond would provide the funding it initially pledged to help RVA Diamond Partners build the stadium, offered an attractive alternative that would allow the Squirrels to meet the MLB's deadlines and keep the team in Richmond. Ultimately, the City, the EDA, and RVA Diamond Partners (which only consisted of Thalhimer at that point) agreed.

51. The City and the EDA carved out a portion of the Diamond District, which was given to the Squirrels to build the stadium. Notably, the City and the EDA withheld from the Squirrels a 0.8-acre parcel of land adjacent to the planned entrance to the new stadium. The Squirrels objected but the City, the City Council members who selected RVA Diamond Partners, and the EDA said the 0.8-acre parcel was not available to the Squirrels because it was earmarked for an "African American-owned food court" that would be non-competitive with the Squirrels' concessions and was needed to satisfy the requirement that 40% of the Diamond District be reserved for minority business enterprises.[16]

[16] Richmond EDA Press Release, *City of Richmond Provides Update on Diamond District* (May 8, 2023), https://richmondeda.com/news-resource/diamond-district-moves-forward.

52. DiBella and the Squirrels made multiple offers to buy or lease the parcel—both at fair-market and above-market prices—but Thalhimer rejected those offers. On information and belief, Guillot and Thalhimer viewed the parcel as leverage with DiBella and the Squirrels and refused to sell it to retaliate against DiBella and the Squirrels for taking over the stadium project. The City and the EDA were aware that DiBella and the Squirrels believed Thalhimer and Guillot were using this parcel to exert pressure.

53. Machete Group broke ground on the new stadium—which would later be named CarMax Park—in early September 2024. Ultimately, DiBella's ownership group agreed to spend between $15 and $20 million of its own money to deliver a stadium consistent with other recently delivered, first-class Minor League Baseball stadiums in compliance with MLB requirements and able to generate enough baseball and non-baseball revenue to sustain the Squirrels' annual rent of over $3 million, which on information and belief is the highest paid by any Minor League Baseball team.

54. The stadium was completed in 2026, and the Squirrels played (and won) their first game there on April 7, 2026. Despite DiBella's success in designing, developing, and building the stadium, disputes persisted between DiBella and the Squirrels on the one hand and the City, the EDA, Guillot, and Thalhimer on the other.

***DiBella and Guillot get into a heated conversation during opening night for the Squirrels' new stadium.***

55. On April 7, 2026, CarMax Park officially opened for the Squirrels' first home game of the season. DiBella and Squirrels' co-owner Larry Botel attended the game. So did Guillot and others from Thalhimer, the EDA, and the City.

56. In the weeks prior to opening night, Botel and Guillot had been in communication regarding the 0.8-acre parcel adjacent to CarMax Park. Although City officials and the EDA

initially represented to DiBella and the Squirrels that the parcel would be used for an African American-owned food court that would be non-competitive with the Squirrels' concessions, Botel heard rumors that Thalhimer intended to lease the land to a sports-and-entertainment bar that would directly compete with the Squirrels.

57. Specifically, DiBella, Botel, and the Squirrels heard from a former Squirrels executive, Todd Parnell, that Thalhimer had engaged in conversations (that DiBella was aware of) about Thalhimer naming a business in the Diamond District after Parnell. Parnell learned from a Thalhimer-affiliated broker shortly before opening day that Thalhimer planned to put a sports bar and restaurant on the 0.8-acre parcel. Parnell notified DiBella when he learned that Thalhimer planned to put a sports bar and restaurant on the 0.8-acre parcel because Parnell was surprised, given the City's prior representations, that the parcel would be used in a manner so directly competitive with the Squirrels' business.

58. The Squirrels had their real estate broker contact Thalhimer's broker to inquire again whether Thalhimer would sell the parcel to the Squirrels. Thalhimer's broker refused to discuss selling the parcel and confirmed to the Squirrels' broker that Thalhimer was close to finalizing a deal for a sports bar and restaurant.[17]

59. Around the same time, Guillot stopped responding to Botel's communications about the parcel, so when Botel realized Guillot was at the game on opening night, Botel sought out Guillot to speak with him. Botel found Guillot in the hallway near the Squirrels' suite and the

[17] On May 22, 2026, it was publicly announced that EAT Restaurant Partners signed a lease to put an approximately 5,000 square foot sports bar on the parcel adjacent to CarMax Park. *See* Meredith Lindemon, *EAT Restaurant Partners planning Diamond District sports bar*, Richmond Times-Dispatch (May 22, 2026), https://richmond.com/life-entertainment/local/food-drink/article_37dfe296-eea2-49a0-9ee0-4429989f9850.html.

team's offices at the stadium. As Botel and Guillot were talking, DiBella came over and joined the conversation. DiBella and Botel did not "corner" Guillot, as Guillot later claimed.

60. No one else was nearby during this discussion except a security guard standing in front of the Squirrels' offices.

61. DiBella began discussing the Diamond District development project, generally. He noted his concerns that Thalhimer and the City were not living up to their promises to develop the remaining land in a timely fashion. CarMax Park was the only finished piece of the Diamond District development project. No other project within the 67 acres had been started, let alone finished. And it was bad for the Squirrels' business to have their new park surrounded by nothing but a construction site. DiBella did not specifically mention the 0.8-acre parcel of land that was a source of tension between the Squirrels and Thalhimer and Guillot.

62. DiBella told Guillot, however, that he was frustrated with Guillot and Thalhimer, and he believed they lied to the City during the bidding process for the contract to develop the Diamond District and after. DiBella said he felt obligated to expose the truth about the bidding process and Thalhimer's fraud, and he would hire lawyers if necessary to protect his business.

63. DiBella also said that Guillot lied during the September 2023 meeting with MLB, and DiBella knew Guillot was now trying to compete with the Squirrels on the team's front lawn. DiBella said he thought the parcel could never be used to compete with the Squirrels because of representations the City and the EDA made that it would be used for a non-competitive food court, and DiBella believed the footprint for the Squirrels' stadium was carved out under false pretenses.

64. Guillot remained quiet for most of the conversation. Then, without warning, Guillot suddenly turned to DiBella and said, "You know everybody hates you right? The City hates you! I hate you!"

65. DiBella was trying to discuss legitimate grievances with Guillot, and Guillot responded with petty insults. He continued in a diatribe against DiBella, raising his voice and asserting that, as the developer, he could always do whatever he wanted with the 0.8-acre parcel, and there was never any false pretense in the representation that the 0.8-acre parcel would be non-competitive. The conversation was heated. And after a few minutes, DiBella said that he was not going to talk to Guillot anymore and turned to leave. Guillot appeared to be intoxicated, and DiBella wanted to go before tensions escalated further.

66. As DiBella was leaving, Guillot goaded DiBella, calling out: "What are you going to hit me?" DiBella responded unequivocally that he would never hit Guillot. He said, "Of course not, I would ***never*** do that. I don't hit people, but I'd love to bitch slap you." Guillot yelled back, "c'mon hit me now!" DiBella again repeated that he would ***not*** hit Guillot and then said an approximate quote from one of his favorite movies, the 1982 film *Diner*, featuring Mickey Rourke and Kevin Bacon. He said, "But if I did hit you, I'd hit you so hard, I'd hurt your whole family." After that, DiBella returned to his suite. Botel remained quiet during this exchange between DiBella and Guillot.

67. DiBella intended this as a joke. It was not meant as an actual or serious threat. And no reasonable person could have perceived it as such. *First*, DiBella expressly said multiple times that he would never hit Guillot. *Second*, DiBella used a conditional construction rather than a declarative construction (i.e., "if I did," not "I will"). *Third*, DiBella's statement was based on unreal conditions—it is literally impossible for DiBella to hit Guillot so hard that it would hurt Guillot's whole family. *Fourth*, DiBella's words were not manipulative in the way of conditional threats because he did not demand anything in return from Guillot. *Fifth*, his statements contained hyperbole characteristic of humorous language. *Sixth*, Guillot provoked DiBella, using phrases

common in movies and TV ("what are you going to hit me?" and "c'mon hit me now"), so it is not surprising that DiBella replied with a softened paraphrase from a movie. Thus, Guillot could not have construed DiBella's statement as a threat of harm. It was clearly a hyperbolic statement made in the context of a heated discussion, during which Guillot told DiBella that he, the City, and everyone hates DiBella.

68. According to Botel, the only participant in the conversation other than DiBella and Guillot, Guillot did not appear frightened or threatened by DiBella's comment. Throughout the entire discussion, Guillot never moved, flinched, or did anything to indicate that he felt threatened by or afraid of DiBella. Guillot remained to talk with Botel after DiBella returned to his suite.

69. Botel also did not perceive DiBella's words to be a threat. In fact, Botel later conveyed to Angie Rodgers that DiBella never threatened Guillot.

70. Moreover, Guillot has attended several Squirrels games with members of his family since this conversation with DiBella and Botel, including the game on April 9—just two days later. If he felt threatened or had any concern for his safety, Guillot would have reported DiBella to law enforcement and stopped bringing his family to the stadium. Instead, he reported DiBella to Angie Rodgers, the Director of Economic Development at the EDA—a City official with no authority to investigate alleged criminal activity but with substantial influence over DiBella and Guillot's business dealings—further underscoring Guillot's intent to harm DiBella's reputation to gain a commercial advantage.

71. In fact, Guillot texted Rodgers that same night writing "Lou just threatened me and my family ... [a]nd he threatened to 'bitch slap me' because we won't sell him that parcel."




72. Alarmed by Guillot's (false) version of events, which incorrectly characterized DiBella's statements as a "threat" to him and his family (and which Rodgers understood as a threat of physical violence to obtain the parcel), Rodgers replied, "what in the entire hell" and proclaimed that "we (the city) have got to call [DiBella] on this," reflecting the clear, immediate reputational harm Guillot's false statements caused.

73. The next day, Guillot reached out to Rodgers again, stating that he "fe[lt] like [he] need[ed] to document in writing the course of events last night and the threats [DiBella] made." Rodgers agreed that was "appropriate."



74. On information and belief, Guillot also repeated these false and defamatory statements—including that DiBella "threatened his life and his family" if DiBella did not sell him the parcel—to Rodgers on the phone sometime between April 7 and April 9, 2026.

***Guillot defames DiBella to Angie Rodgers and others, and Rodgers repeats Guillot's false claim to pressure DiBella and gain concessions from the Squirrels.***

75. On April 9, 2026, Rodgers called DiBella and conveyed to him that she had heard "a serious allegation" about DiBella—once again emphasizing that Rodgers understood from Guillot that DiBella made legitimate threats of physical harm against Guillot.

76. Alarmed by Rodgers' claim, DiBella took contemporaneous notes documenting his conversation with Rodgers.[18]

77. As DiBella's notes reflect, during this April 9 call, Rodgers said to DiBella that Guillot told her directly that DiBella "***threatened [Guillot's] life and fam[ily]***" if Guillot did not sell DiBella the 0.8-acre parcel.

[18] A true and correct copy of DiBella's contemporaneous notes is attached as **Exhibit A** and incorporated by reference.




78. Shortly after his call with Rodgers, DiBella texted Botel about Guillot's allegations, noting that it was "insane" that Guillot "is spreading a narrative that [I] threatened his life and his family if we don't get the parcel."

**Lou DiBella <[redacted]>** **April 09, 2026 6:12:40 PM**

Larry, he is spreading a narrative that i threatened his life and his family if we don't get the parcel

**Lou DiBella <[redacted]>** **April 09, 2026 6:12:50 PM**

That is insane.

79. In other words, Guillot falsely and brazenly told the head of economic development at the EDA—the primary City official overseeing the Diamond District project and DiBella and

the Squirrels' landlord—that DiBella tried to extort Guillot with threats of physical violence against Guillot and harm to his family.

80. What's worse, Guillot acted with actual malice because he knew this claim was false when he made it. Guillot was a participant—along with DiBella and Botel—in the heated discussion on opening night during which Guillot claims DiBella threatened and extorted him. Thus, he knew for a fact before he made his false claim to Rodgers that DiBella never threatened him or his family, and DiBella did not try to obtain the 0.8-acre parcel through threats of violence. Yet Guillot made this false accusation to Rodgers anyway.

81. Rodgers is not a law enforcement official. She has no authority to investigate threats. So why would Guillot report his interaction with DiBella to her? Because he falsely linked DiBella's purported threats to the 0.8-acre parcel, and on information and belief, he wants to: (1) tarnish DiBella's sterling reputation for integrity and harm DiBella's good name in the eyes of City officials overseeing the Diamond District, (2) gain leverage in Thalhimer's ongoing commercial disputes with DiBella and the Squirrels, and (3) retaliate against DiBella for accusing Guillot and Thalhimer of making material misrepresentations during the Diamond District bidding process and after.

***Rodgers links Guillot's false claim to ongoing commercial negotiations with DiBella.***

82. The call DiBella received from Rodgers on April 9 was the first time DiBella learned that Guillot had lied about what DiBella said to Guillot during opening night. On information and belief, Guillot repeated this false claim to others too, including in a memo dated April 8, 2026, that he sent to City officials and that DiBella learned about later, and in phone calls to Rodgers, other City officials, and the media.

83. DiBella never threatened to harm Guillot or his family. Nor did DiBella ever try to extort Guillot to obtain the 0.8-acre parcel adjacent to CarMax Park. To the contrary, DiBella was

crystal clear that he would ***never*** hit Guillot. The only reference DiBella ever made to Guillot's family was to state that ***he would never hit Guillot***, but if he did it would hurt Guillot and his family. Clearly, this was not a threat to harm Guillot's family. It was a literally impossible, conditional, hyperbolic statement made during a heated conversation that could not have been perceived as a threat and was not perceived as a threat by Guillot who returned to CarMax Park just two days later ***with his family***.

84. Nonetheless, Guillot falsely conveyed to Rodgers multiple times that DiBella threatened him and his family to extort the 0.8-acre parcel from Defendants—a felony and federal crime if true. By her own admission, Rodgers clearly understood Guillot to be conveying a "serious allegation" about DiBella.

85. In response to Rodgers repeating Guillot's false accusation, DiBella became upset. He emphatically explained that Guillot was ***lying***, and he urged Rodgers to speak to Botel, who could corroborate that DiBella never threatened or extorted Guillot. Then DiBella hung up.

86. Rodgers texted DiBella that he was "[c]ompletely inappropriate," and she wanted to talk to him because she was "trying to say something to you that I really don't want to put in email." DiBella again made clear that Guillot's accusation was "completely fictional" and "unfounded." DiBella reiterated that Botel was "there for the entire conversation." This April 9 text exchange between DiBella and Rodgers is below, with DiBella's texts in blue and Rodgers' texts in gray:







87. Shortly after Rodgers' call with DiBella on April 9, she spoke with Botel. Botel told her expressly that Guillot's claim was not true. Botel explained to Rodgers that DiBella never threatened Guillot. And DiBella certainly did not threaten Guillot's life and his family if Guillot did not sell DiBella the 0.8-acre parcel of land. Rodgers did not correct Botel or say that Guillot never made any such statement to her or that she never repeated any such statement to DiBella.

88. Instead, Rodgers turned the conversation to the broader situation relating to the Diamond District. Rodgers said that her goal was to get the City to be able to do the infrastructure work for the Diamond District, which was being blocked by the fact that VCU needed to sell Sports Backers Stadium—where VCU's soccer and other teams played—to the City.

89. At the time, Sports Backers was owned by VCU. The City agreed to pay $25 million to VCU to purchase Sports Backers because the City needed the land for infrastructure for the Diamond District. The City also agreed to transfer the remaining property to Diamond District Partners (effectively, Thalhimer) for a fraction of what the City paid to acquire the land. VCU was refusing to close on the sale of Sports Backers to the City because the City had not provided VCU with adequate assurances that VCU's baseball team would be allowed to play at CarMax Park. VCU subsequently sold Sports Backers to the City on or around May 30, 2026.[19]

90. After Rodgers' April 9 call with Botel, she spoke to DiBella again. She did not apologize for repeating Guillot's accusation, which she now knew was false. DiBella said he was shocked that Rodgers would discuss business with Botel after making such a serious accusation. Rodgers replied that she and Botel were simply being professional and DiBella should be too.

91. She then raised the issue of VCU being allowed to play at CarMax Park, connecting that issue to the need for infrastructure to commence on land currently occupied by Sports Backers and owned by VCU for the benefit of CarMax Park and the Diamond District. DiBella saw Rodgers as using Guillot's false accusation to pressure DiBella to enter into an operating agreement with VCU that would require the Squirrels to maintain the field and stadium for VCU's use. This agreement would have the domino effect of allowing VCU to sell Sports Backers Stadium to the City, unlocking the ongoing development gridlock.

92. VCU's use of CarMax Park was an ongoing point of negotiation between DiBella, Thalhimer, and the City—along with negotiations over the 0.8-acre parcel—and DiBella could not

[19] *See* Eric Kolenich, *VCU, city strike long-awaited deal to sell Sports Backers Stadium*, Richmond Times-Dispatch (May 30, 2026), https://richmond.com/news/local/government-politics/article_6a831169-1db8-4957-9a63-25761e497cc9.html.

believe that Rodgers would raise this contentious issue immediately after she brought up Guillot's false allegation that DiBella tried to extort him.

93. DiBella and the Squirrels have no obligation to maintain the field and stadium and share MLB-used spaces with VCU, and DiBella has been clear that he currently does not intend to do so. That's why Rodgers used Guillot's false allegation that DiBella engaged in criminal conduct to pressure DiBella to close a deal to maintain CarMax Park for VCU's use. On information and belief, Rodgers, Guillot, and Thalhimer thought that Guillot's false accusation provided a pressure point that the EDA and Thalhimer could use as leverage against DiBella in their business dealings.

***Guillot's false and defamatory statement has harmed DiBella's reputation.***

94. The morning after DiBella's call with Rodgers, DiBella texted Botel to express his sincere concerns that his reputation had been seriously damaged in the eyes of Rodgers, the EDA, and the City. Botel reassured DiBella that he knew that Guillot's allegations were "100% a lie."

**Lou DiBella <[redacted]>** **April 10, 2026 8:55:10 AM**

Larry ... i'm a mess. The allegation that Guillot made is extremely serious. Leadership of this City accepting it is incredibly damaging to me/us and anything out of my mouth sounds defensive/self serving. Factory she called me emphasizes the credibility the City put in the allegation; there's no way else to view it. And, as much as i despise Jason i didn't think he was capable of this.

**Larry Botel <[redacted]>** **April 10, 2026 9:24:01 AM**

It's 100% a lie. We need to set the record straight and take appropriate action.

95. As head of the EDA, Rodgers essentially functions as DiBella's landlord and business partner. The Squirrels signed a 30-year lease on CarMax Park with the City. Guillot's

false and defamatory claim that DiBella tried to extort him and threatened his life and his family had—and continues to have—serious consequences for DiBella's business and reputation.

96. Not only is extortion a felony under Virginia law and a federal crime,[20] such accusations about DiBella could expose DiBella to severe penalties pursuant to the Squirrels' license agreement with MLB. That agreement grants the Commissioner of Baseball "the definitive and independent authority" to "investigate any act, omission, transaction, or practice charged, alleged, or suspected to be in violation of this Agreement or any other MLB PDL Rules and Regulations or to not be in the best interests of baseball" and to "determine after investigation what preventative, remedial, or punitive action is appropriate and to take such action."

97. Such punitive action could include suspensions or fines against DiBella and the Squirrels' ownership group. The Commissioner could even decide to oust DiBella, take away his status as managing member of Navigators Baseball, or revoke Navigators Baseball's license.

98. Beyond this, DiBella prides himself on always acting with integrity, and he has prioritized integrity in all his business dealings—as evidenced by the fact that DiBella is the only boxing promoter to ever win the BWAA's award for integrity and honesty. Guillot's false statement to Rodgers accused DiBella of unethical and dishonest criminal conduct that seriously harmed his hard-earned reputation for integrity.

99. On information and belief, based on Rodgers' comments to DiBella during his April 9 communications with her and Rodgers' text messages to Guillot, Guillot's allegation hurt

---

[20] *See* Va. Code § 18.2-59 ("Any person who ... threatens injury to the character, person, or property of another person ... and thereby extorts money, property, or pecuniary benefit ... is guilty of a Class 5 felony."); *Dimaio v. Commonwealth*, 621 S.E.2d 696, 767-68 (Va. Ct. App. 2005) (upholding felony conviction for attempted extortion); *see also* 18 U.S.C. § 1951 (outlawing attempted extortion that affects interstate commerce); *United States v. Bengali*, 11 F.3d 1207, 1208-09 (4th Cir. 1993) (upholding attempted extortion conviction under the Hobbs Act).

DiBella's professional reputation in the eyes of Rodgers—the head of the agency overseeing a massive development project with substantial economic ramifications for DiBella and the Squirrels—and others, including the Mayor of Richmond Danny Avula.

100. Moreover, the repetition of this false claim by Rodgers or Guillot to other City officials, business leaders, or anyone else would amplify the harm to DiBella exponentially.

101. As a result of Defendants' defamation, DiBella has also incurred more than $75,000 in fees since April 1, 2026, for a public relations firm in part to try to mitigate the reputational harm caused by Defendants' defamation.

102. DiBella was shocked, angered, and confused to learn from Rodgers of Guillot's false accusation that DiBella engaged in dishonest, criminal conduct (i.e., extortion). And DiBella cannot let such a brazen attack on his integrity and character go uncorrected. He therefore brought this lawsuit to vindicate his reputation and protect his business interests.

***DiBella learns that Defendants also sent a memo making additional false and defamatory statements about DiBella to the City; those claims were widely republished by the media.***

103. After DiBella filed his original Complaint on May 28, 2026, he learned from the media that Defendants also defamed him in a memo dated April 8, 2026, which Defendants sent to Rodgers, Sharon Ebert, the Deputy Chief Administrative Officer for Planning & Economic Development for the City of Richmond, Mayor Avula, and other City officials.

104. The memo was signed by Guillot in his role as General Manager of Diamond District Partners, LLC and by Maritza Pechin, Thalhimer's Director of Development.

105. In the memo, Defendants set forth their own, false version of the conversation Guillot had with DiBella and Botel at CarMax Park on April 7, 2026. They wrote:

> … Lou and Larry continued to corner Jason and told him that if he and Diamond District Partners (DDP) don't relinquish control of a parcel of land outside the ballpark and sell it to them to develop, that ***Lou himself would do everything in his power to put DDP out of business***, adding that if DDP tries to develop that parcel

> ourselves, that he ***(Lou) would come after Jason and his family with everything he has.***
>
> Jason rebuffed Lou, claiming that he was willing to continue to discuss a lease of the property (potential lease negotiations have been ongoing between DDP and the Squirrels), but not under these kinds of threats. (Emphasis added.)

106. Defendants' statements in the memo are false.

107. DiBella and Botel did not "corner" Guillot. Botel said "hi" to Guillot as Guillot was returning to his suite. Botel and Guillot started talking, and about two minutes later, DiBella walked up and joined the conversation.

108. DiBella did not threaten to "do everything in his power" to put Diamond District Partners out of business to obtain the 0.8-acre parcel. He did not threaten to "come after" Guillot and his family "with everything he has" if Diamond District Partners tries to develop the parcel. He did not threaten Guillot at all. To the contrary, DiBella repeatedly said he would ***never*** hit Guillot. He did not mention trying to obtain the 0.8-acre parcel. He did not tie the parcel to any kind of threat.[21] He did not say anything about putting Diamond District Partners out of business. And the only reference DiBella made to Guillot's family was when he said he would never hit Guillot and repeated a literally impossible, hyperbolic movie quote.

109. This memo is further evidence that Defendants acted with actual malice. The memo is dated April 8, 2026—months before DiBella filed this lawsuit. On information and belief, the reason Defendants documented Guillot's conversation with DiBella in a formal memo and sent it to the City was to spread their false statements about DiBella to as many people as possible.

[21] DiBella's only reference to the parcel was to state that he believed, based on the City and EDA's representations, that it would be used for a food court that would not compete with the Squirrels' business.

110. By putting these allegations in a formal memo, Defendants conveyed to Rodgers, Ebert, Mayor Avula, and others that DiBella made serious threats to harm Guillot's business and family if Guillot did not relinquish the parcel. In fact, Defendants falsely stated in their memo that DiBella had made "threats" to obtain the 0.8-acre parcel. They wrote: "Jason rebuffed Lou, claiming that he was willing to continue to discuss a lease of the property ... but ***not under these kinds of threats***." (Emphasis added.)

111. After Defendants emailed their memo directly to Mayor Avula, he texted Guillot and Pechin saying he was "[s]o sorry that you both have to deal with this foolishness."

112. Multiple media outlets also obtained the memo through public records requests to the City and / or from Defendants directly.

113. On information and belief, Defendants sent their memo to Rodgers, Ebert, and Mayor Avula because they knew (and intended that) the City would share the memo with the media. Reporters in Richmond regularly submit requests for public records relating to the Diamond District. Indeed, as early as March 2024, local media outlets such as Richmond BizSense were submitting FOIA requests to the City about the Diamond District and writing articles based on those documents.[22] That is exactly what happened with the memo.

114. If Defendants did not want the memo leaked, they could have relayed their false statements to Rodgers and Ebert orally. By putting their allegations in a written memo and sending that memo to the City, however, Defendants ensured that their allegations would be shared with

[22] *See, e.g.*, Spiers, Jonathan, Richmond BizSense, *Inside Baseball: The behind-the-scenes battle that got Richmond's new ballpark across home plate* (Nov. 27, 2024), https://richmondbizsense.com/2024/11/27/inside-baseball-the-behind-the-scenes-battle-that-got-richmonds-new-ballpark-across-home-plate-2/ ("Emails obtained by Richmond BizSense through Freedom of Information Act requests to the city reveal how contentious that process became.").

the press.[23] Given the extensive prior media coverage of the Diamond District, there was no doubt that Defendants' memo would generate additional media coverage.

115. Worse, Defendants took affirmative steps to ensure that the media wrote about the memo. As evidenced by the City of Richmond's FOIA Request Portal, the day after DiBella filed his original complaint, someone submitted a FOIA request seeking "***a copy of a memo*** sent to city officials including EDA Director Angie Rodgers and Mayor Danny Avula from Jason Guillot with Thalhimer Realty Partners/Diamond District Partners regarding an incident involving Lou DiBella at CarMax Park on April 7, 2026."[24]

116. Nobody except for Defendants and the City knew of the existence of the memo at this point. Yet somehow, the FOIA requester knew to specifically ask for the memo.

117. On information and belief, this request was submitted by Richmond BizSense reporter, Jonathan Spiers, who had been working on a story about the April 7, 2026 conversation since before DiBella filed his Complaint. On information and belief, Defendants told Spiers about the conversation then tipped him off about the memo and told him the City had the memo, so he could request it through FOIA. In doing so, Defendants specifically intended for the media to obtain the memo and repeat and republish Defendants' false and defamatory statements to the general public, causing further damage to DiBella's reputation.

118. Once DiBella filed his lawsuit, it became urgent for Defendants to have their false counternarrative published as quickly as possible.

---

[23] Defendants did not mark their memo as "Confidential." On information and belief, Defendants also did not request confidential treatment of their memo by the City, which they could have done to prevent its disclosure in response to public records requests. *See* Va. Code § 33.2-299.7.

[24] *See* City of Richmond, FOIA Request Portal, *available at* https://rva.justfoia.com/publicportal/home/track, FOIA-2026-83, (last visited Aug. 27, 2026) (emphasis added).

119. Even if DiBella had not brought this lawsuit to repair his reputation, Defendants' false and defamatory statements would have been widely spread to the public regardless—because Defendants always intended for them to be.

120. Between June 1 and June 18, 2026, at least five media outlets—The Richmonder, Richmond BizSense (in two separate articles), WRIC ABC 8 News, WTVR CBS 6 News Richmond, and the Richmond Times-Dispatch—published articles online repeating Defendants' false and defamatory statements.[25]

121. Most of these news reports were published weeks before Defendants filed their Answer to DiBella's Complaint on June 18, 2026, which included the memo as an exhibit. Therefore, the media obtained the memo directly from Defendants or through public records requests to the City. Either way, Defendants are liable for the media's republication of their false claims, which was a natural, probable, and intended consequence of Defendants' original publication.

---

[25] *See, e.g.*, Michael Phillips, *Lou DiBella's dog bit Diamond District developer on Flying Squirrels opening night, according to account from Thalhimer execs*, The Richmonder (June 1, 2026), https://www.richmonder.org/lou-dibellas-dog-bit-diamond-district-developer-on-flying-squirrels-opening-night-according-to-account-from-thalhimer-execs-2/; Jonathan Spiers, *'Sorry about last night': Thalhimer memo sheds more light on opening-night face-off with Squirrels owner*, Richmond BizSense (June 1, 2026), https://richmondbizsense.com/2026/06/01/sorry-about-last-night-thalhimer-memo-sheds-more-light-on-opening-night-face-off-with-squirrels-owner/; Jonathan Spiers, *Emails: Squirrels owners offered $1.75M for disputed parcel beside CarMax Park; Thalhimer wanted $3M*, Richmond BizSense (June 18, 2026), https://richmondbizsense.com/2026/06/18/emails-squirrels-owners-offered-1-75m-for-disputed-parcel-beside-carmax-park-thalhimer-wanted-3m/; Claire Gehlich, *CarMax Park defamation lawsuit left out alleged dog attack*, WRIC ABC 8 News (June 5, 2026), https://www.wric.com/news/taking-action/squirrels-defamation-suit-alleged-dog-attack-memo/; Tyler Layne, *Dog bite, threats and a lawsuit: What memo reveals about Diamond District feud*, WTVR CBS 6 News Richmond (June 6, 2026), https://www.wtvr.com/news/local-news/richmond/thalhimer-executives-memo-diamond-district-feud-june-6-2026; Eric Kolenich, *5 things to know about the Diamond District defamation lawsuit*, Richmond Times-Dispatch (June 8, 2026), https://richmond.com/news/local/business/article_08236e7d-09b5-4abe-ab10-2522bf68cef2.html.

## CLAIMS

### COUNT ONE
### DEFAMATION PER SE FOR GUILLOT'S TEXT MESSAGE AND ORAL STATEMENT(S) TO RODGERS
(*Against All Defendants*)

122. DiBella repeats, re-alleges, and incorporates by reference the foregoing paragraphs as if set forth fully herein.

123. On April 7, 2026, Defendant Jason Guillot texted Angie Rodgers that DiBella "threatened [him] and [his] family" and further "threatened to 'bitch slap [him]' because [Thalhimer] won't sell him that parcel."

124. Guillot published this false and defamatory statement in Virginia by conveying it in writing in a text to at least one third party, Rodgers. On information and belief, Guillot orally published this defamatory claim to Rodgers and possibly others, as discovery is expected to reveal, telling her that DiBella threatened the life of Guillot and his family if Guillot would not sell him a 0.8-acre parcel that DiBella and the Squirrels had been trying to acquire from Defendants.

125. Guillot's statement is of and concerning DiBella—it identifies DiBella expressly by name and refers to DiBella's actions. Moreover, Rodgers clearly understood the statement to be of and concerning DiBella because she contacted DiBella shortly after Guillot made the false and defamatory statement to her.

126. Guillot's statement is a false statement of fact and is reasonably understood as such. Specifically, whether DiBella threatened Guillot and his family if Guillot did not sell the 0.8-acre parcel to DiBella is reasonably susceptible of being proved true or false. And it is demonstrably false. DiBella never threatened Guillot or his family, and he certainly never sought to obtain the 0.8-acre parcel through threats of violence against Guillot and his family.

127. Guillot's statement is not substantially true. The gist or sting of Guillot's statement is that DiBella committed a felony by making a serious threat to Guillot's life and his family if Guillot did not sell DiBella the 0.8-acre parcel. This is substantially worse than the literal truth—i.e., that DiBella expressly said he would never hit Guillot and made a literally impossible, hyperbolic statement expressing his frustration with Guillot in the context of a heated discussion about a longstanding business dispute, during which Guillot said he hates DiBella and goaded DiBella by saying, "What are you going to hit me?" Guillot's false statement tends to have, and did have, a materially different impact on the mind of the average listener than the truth.

128. DiBella never actually threatened Guillot. Nor did he mention trying to obtain the 0.8-acre parcel, which is significant because, by tying DiBella's alleged threats to a demand that Defendants relinquish the parcel, Guillot's false statement accused DiBella of felony extortion. Guillot then conveyed to Rodgers that DiBella extorted Guillot and threatened his life and his family to obtain the 0.8-acre parcel. Rodgers understood what Guillot said to be a "serious accusation" about DiBella, and she responded to Guillot: "what in the entire hell. I think we (the city) have got to call him on this."

129. There is a stark difference between DiBella's literally impossible, conditional, hyperbolic, non-threat with no extortion demand and Guillot's claim that DiBella made a serious felony threat of physical harm to extort land.

130. Guillot's statement is defamatory. It tends to, and did, expose DiBella to hatred, ridicule, or contempt in the minds of a considerable and respectable segment in the community, tends to impair his standing in the community, tends to lower the esteem in which he is held, and tends to discourage others from associating with him, including by accusing him of a serious felony and federal crime (i.e., of using threats of physical violence to extort property). Rodgers

understood Guillot's statement to be defamatory as evidenced by the fact that she quickly called DiBella and told him that she had heard a "serious allegation" about him.

131. Guillot's statement is defamatory *per se* because it accuses DiBella of extortion—a serious crime of moral turpitude. It is also defamatory *per se* because it tends to harm DiBella in his profession. It attributes to him unfitness to perform the duties of his profession (as a boxing promoter and a Minor League Baseball team owner) and foreseeably hurt DiBella in his profession. This defamatory meaning is also apparent on the face of Guillot's statement, without the need of extrinsic evidence. DiBella is therefore entitled to presumed damages.

132. Guillot knew of the substantial danger of injury to DiBella and DiBella's reputation from his false statement. He published it to Rodgers—a government official with authority over the Diamond District project and Guillot and Thalhimer's business dealings—expressly to harm DiBella's standing with a key government regulator and for his own and Thalhimer's benefit.

133. Guillot published the statement to Rodgers with actual malice. He had subjective awareness of its falsity. Guillot was ***present*** during and was ***a participant in*** the April 7, 2026 conversation with DiBella and therefore was fully aware that DiBella did not threaten to kill Guillot or his family if Guillot did not sell DiBella the parcel.

134. At a minimum, Guillot acted with reckless disregard for the truth of his statement, as evidenced by the facts that Guillot: (1) personally resented DiBella, as Guillot himself admitted; (2) leveraged that animus and the false accusation he made about DiBella to try to gain concessions from DiBella and the Squirrels to advance Thalhimer's negotiating position; and (3) wanted to retaliate against DiBella for accusing Guillot and Thalhimer of fraud.

135. Guillot had no applicable privilege or legal authorization to publish the defamatory statement to Rodgers and others, or, if he did, he abused that privilege. Guillot published his

defamatory statement in bad faith and with actual malice and common law express malice such that any potentially applicable privilege is vitiated and cannot apply.

136. Guillot published this statement while acting within the scope of his employment at Thalhimer and in furtherance of Thalhimer's business, including by leading Thalhimer's Diamond District development team and coordinating with the City and the EDA.

137. Because Guillot published this false and defamatory statement to Rodgers in his role as lead of Thalhimer's Diamond District development team and within the context of the ongoing negotiations among the parties about the Diamond District, Guillot's defamatory act was naturally incident to Thalhimer's business, expressly or impliedly directed by Thalhimer, and done with the apparent authority and agency of Thalhimer.

138. Moreover, Guillot was acting within the scope of his role as a principal for Thalhimer and was engaged in services for Thalhimer when he published the statement—he was liaising with the EDA about the Diamond District project.

139. Guillot published the statement to further Thalhimer's interests, leveraging it to gain advantage in Thalhimer's ongoing negotiations with DiBella, the Squirrels, and the City over the Diamond District project. Thalhimer is subject to liability for Guillot's defamatory statement.

140. Defendants' actions were malicious, willful, and wanton, and evidence a conscious disregard for DiBella's rights. Accordingly, punitive damages are appropriate.

141. As a direct and proximate result of Guillot's defamatory statement to Rodgers, DiBella has suffered substantial economic, reputational, and other damage, as well as embarrassment, humiliation, and emotional distress.

142. DiBella has also spent more than $75,000 since April 1, 2026, on a public relations firm in part to try to mitigate the reputational harm caused by Defendants' defamation.

143. In view of the foregoing, DiBella is entitled to actual, presumed, and punitive damages in amounts to be specifically determined at trial.

**COUNT TWO**
**DEFAMATION PER SE FOR DEFENDANTS' APRIL 8 MEMO**
(*Against All Defendants*)

144. DiBella repeats, re-alleges, and incorporates by reference paragraphs 1–121 as if set forth fully herein.

145. Defendants published the following false and defamatory statements concerning DiBella in a memo dated April 8, 2026:

> … Lou and Larry continued to corner Jason and told him that if he and Diamond District Partners (DDP) don't relinquish control of a parcel of land outside the ballpark and sell it to them to develop, that ***Lou himself would do everything in his power to put DDP out of business***, adding that if DDP tries to develop that parcel ourselves, that he ***(Lou) would come after Jason and his family with everything he has.***
>
> Jason rebuffed Lou, claiming that he was willing to continue to discuss a lease of the property (potential lease negotiations have been ongoing between DDP and the Squirrels), but not under these kinds of threats. (Emphasis added.)

146. Defendants published these false and defamatory statements in Virginia by conveying them in writing to multiple third parties including Angie Rodgers, Sharon Ebert, Mayor Avula, and other City officials. On information and belief, Defendants also published these defamatory claims to others, as discovery is expected to reveal.

147. These statements are of and concerning DiBella—they identify DiBella expressly by name, in writing, and refer to DiBella's actions. Moreover, Rodgers clearly understood the statements to be of and concerning DiBella because she contacted DiBella shortly after Defendants conveyed the false and defamatory statements to her.

148. These statements are false statements of fact and are reasonably understood as such. Specifically, whether DiBella threatened to "come after" Guillot and his family and "do everything

in his power" to put Diamond District Partners out of business if Guillot did not sell the 0.8-acre parcel of land to DiBella are reasonably susceptible of being proved true or false. And they are demonstrably false. DiBella never threatened Guillot or his family, and he certainly never sought to obtain the 0.8-acre parcel through threats of coercive and underhanded business tactics such as doing everything in his power to put Diamond District Partners out of business.

149. These statements are not substantially true. The gist or sting of Defendants' statements is that DiBella committed a felony by making a serious threat to harm Guillot, his family, and his business if Guillot did not sell DiBella the 0.8-acre parcel. This is substantially worse than the literal truth—i.e., that DiBella expressly said he would never hit Guillot and made a literally impossible, hyperbolic statement expressing his frustration with Guillot in the context of a heated discussion about a longstanding business dispute, during which Guillot said he hates DiBella and goaded DiBella by saying, "What are you going to hit me?" Defendants' false statements tend to have, and did have, a materially different impact on the mind of the average reader than the truth.

150. DiBella never actually threatened Guillot. But Defendants conveyed to Rodgers and Ebert that DiBella made a specific and credible threat to extort Guillot and harm his family and his business to obtain the 0.8-acre parcel. Rodgers understood what Defendants conveyed to be a "serious accusation" about DiBella.

151. There is a stark difference between DiBella's literally impossible, conditional, hyperbolic, non-threat with no extortion demand and Defendants' claims that DiBella made a serious felony threat to extort land.

152. These statements are defamatory. They tend to (and did) expose DiBella to hatred, ridicule, and contempt in the minds of a considerable and respectable segment in the community,

tend to impair his standing in the community, tend to lower the esteem in which he is held, and tend to discourage others from associating with him. Rodgers understood Defendants' statements to be defamatory as evidenced by the fact that she quickly called DiBella and told him that she had heard a "serious allegation" about him.

153. These statements are also defamatory *per se* because they accuse DiBella of extortion—a serious crime of moral turpitude—and a want of integrity in the discharge of his duties as a Minor League Baseball team owner, including by falsely accusing him of underhanded, odious, and unsavory business practices (i.e., of threatening the safety and livelihood of others to achieve his own ends) that reflect poorly on and are not in the "best interests of baseball." As such, these statements tend to (and did) harm DiBella in his profession and attribute to him unfitness to perform the duties of his profession. This defamatory meaning is apparent on the face of Defendants' statements, without the need of extrinsic evidence. DiBella is therefore entitled to presumed damages.

154. Defendants knew of the substantial danger of injury to DiBella and DiBella's reputation from these false statements. They published them to Rodgers, Ebert, and other government officials with authority over the Diamond District project and Guillot and Thalhimer's business dealings with DiBella and the Squirrels expressly to harm DiBella's standing with key government administrators and for Defendants' own benefit.

155. Defendants also shared the memo with Mayor Avula—Rodgers and Ebert's boss—who was a key player in the ongoing business relationships and negotiations between Thalhimer, the Squirrels, DiBella, Guillot, the EDA, and VCU. Mayor Avula had acted as a mediator between the parties, often stepping in to defuse tense situations, convey concerns, and find solutions.

Defendants published their false and defamatory statements to Mayor Avula expressly to taint DiBella's reputation in his eyes for Defendants' own benefit.

156. Defendants published the statements to Rodgers, Ebert, Mayor Avula, and other City officials with actual malice. Guillot had subjective awareness of their falsity because he was a participant in the April 7, 2026 conversation with DiBella and Botel and therefore was fully aware that DiBella did not threaten to go after his family or to put Diamond District Partners out of business if Defendants refused to sell him the 0.8-acre parcel.

157. At a minimum, Defendants acted with reckless disregard for the truth of their statements, as evidenced by the facts that they: (1) resented DiBella, as Guillot himself admitted; (2) leveraged that animus and the false accusations they made about DiBella to gain concessions from DiBella and the Squirrels to advance Thalhimer's negotiating position; and (3) wanted to retaliate against DiBella for accusing Guillot and Thalhimer of fraud.

158. Defendants had no applicable privilege or legal authorization to publish the defamatory statements to Rodgers, Ebert, Mayor Avula, and others, or, if they did, they abused that privilege. Defendants published their defamatory statements in bad faith and with actual malice and common law express malice such that any potentially applicable privilege is vitiated and cannot apply.

159. Guillot published these statements while acting within the scope of his employment at Thalhimer and in furtherance of Thalhimer's business, including by leading Thalhimer's Diamond District development team and coordinating with the City and the EDA.

160. Guillot published the statements in a memo on Diamond District Partners letterhead. The memo is "from" Guillot in his role as "General Manger" of Diamond District

Partners and Maritza Pechin, the Director of Development at Thalhimer. Guillot and Pechin both signed the memo.

161. Because Guillot published these false and defamatory statements to Rodgers, Ebert, Mayor Avula, and others in his role as lead of Thalhimer's Diamond District development team (i.e., as General Manager of Diamond District Partners) and within the context of the ongoing negotiations among the parties about the Diamond District, Guillot's defamatory acts were naturally incident to Thalhimer's business, expressly or impliedly directed by Thalhimer, and done with the apparent authority and agency of Thalhimer.

162. Moreover, Guillot was acting within the scope of his role as a principal for Thalhimer and was engaged in services for Thalhimer when he published the statements—he was liaising with the EDA about the Diamond District project.

163. Guillot published the statements to further Thalhimer's interests, leveraging them to gain advantage in Thalhimer's ongoing negotiations with DiBella, the Squirrels, and the City over the Diamond District project. Thalhimer is liable for Guillot's defamatory statements.

164. Defendants' actions were malicious, willful, and wanton, and evidence a conscious disregard for DiBella's rights. Accordingly, punitive damages are appropriate.

165. As a direct and proximate result of Guillot's defamatory statements to Rodgers, Ebert, Mayor Avula, and others, DiBella has suffered substantial economic, reputational, and other damage, as well as embarrassment, humiliation, and emotional distress.

166. These statements were republished by numerous media outlets to millions of readers and a global internet audience. This republication, which was the natural and probable result of Defendants' original publication to Rodgers, Ebert, Mayor Avula, and others increased

the reputational and other harm to DiBella exponentially. Defendants are liable for the damage caused by the republication of their defamatory statements.[26]

167. DiBella has also spent more than $75,000 since April 1, 2026, on a public relations firm in part to try to mitigate the reputational harm caused by Defendants' defamation.

168. In view of the foregoing, DiBella is entitled to actual, presumed, and punitive damages in amounts to be specifically determined at trial.

**COUNT THREE**
**DEFAMATION PER SE FOR THE RICHMONDER'S JUNE 1 REPUBLICATION OF FALSE STATEMENTS IN DEFENDANTS' APRIL 8 MEMO**
(*Against All Defendants*)

169. DiBella repeats, re-alleges, and incorporates by reference paragraphs 1–121 as if set forth fully herein.

170. Defendants published the following false and defamatory statements concerning DiBella in a memo sent to Rodgers, Ebert, Mayor Avula, and other City officials dated April 8, 2026:

> … Lou and Larry continued to corner Jason and told him that if he and Diamond District Partners (DDP) don't relinquish control of a parcel of land outside the ballpark and sell it to them to develop, that ***Lou himself would do everything in his power to put DDP out of business***, adding that if DDP tries to develop that parcel ourselves, that he ***(Lou) would come after Jason and his family with everything he has.***
>
> Jason rebuffed Lou, claiming that he was willing to continue to discuss a lease of the property (potential lease negotiations have been ongoing between DDP and the Squirrels), but not under these kinds of threats. (Emphasis added.)

171. Defendants' statements are false and defamatory as explained above in Count II.

---

[26] The natural and probable republication of Defendants' defamatory statements by third parties increases the damages available to DiBella and gives DiBella new causes of action against Defendants for each republication.

172. On information and belief, Defendants knew when they published this memo to Rodgers, Ebert, Mayor Avula, and others that it would be provided to the media in response to public records requests. The media regularly requests public records relating to the Diamond District.

173. On information and belief, to ensure that the media ***would*** request the memo, Defendants told at least one reporter—most likely Jonathan Spiers—and possibly other reporters, of its existence, and encouraged them to seek it from the City through a FOIA request. Defendants did so before DiBella even filed his original Complaint—meaning that regardless of whether DiBella brought this lawsuit, Defendants would have used the media to spread their false and defamatory narrative to the public.

174. As a natural, probable, and intended consequence of Defendants' publication of this memo to Rodgers, Ebert, Mayor Avula, and other City officials—and leaking its existence to the media—it was subsequently provided to and / or obtained by members of the media, who repeated and republished Defendants' false and defamatory claims.

175. On June 1, 2026, The Richmonder published an article titled "Lou DiBella's dog bit Diamond District developer on Flying Squirrels opening night, according to account from Thalhimer execs," which says:

> In the memo, written by Guillot and Pechin, they lay out their version of the dispute. They wrote: "Lou and Larry (Botel, one of DiBella's associates) continued to corner Jason and told him that if he and Diamond District Partners (DDP) don't relinquish control of a parcel of land outside the ballpark and sell it to them to develop, that Lou himself would do everything in his power to put DDP out of

> business, adding that if DDP tries to develop that parcel ourselves, that he (Lou) would come after Jason and his family with everything he has."[27]

176. The Richmonder also published a hyperlink to the full memo.

177. As a natural and probable consequence of Defendants' original publication of their defamatory statements to Rodgers, Ebert, Mayor Avula, and other City officials and the foreseeable and intended republication of those statements by The Richmonder after Defendants alerted the media that the City had the memo, DiBella has suffered substantial economic, reputational, and other damage, as well as embarrassment, humiliation, and emotional distress.

178. DiBella has also spent more than $75,000 since April 1, 2026, on a public relations firm in part to try to mitigate the reputational harm caused by Defendants' defamation.

179. Defendants are liable for the harm caused by The Richmonder's republication of their false statements to its hundreds of thousands of readers and a global internet audience.[28]

180. In view of the foregoing, DiBella is entitled to actual, presumed, and punitive damages in amounts to be specifically determined at trial.

**COUNT FOUR**
**DEFAMATION PER SE FOR RICHMOND BIZSENSE'S JUNE 1 AND JUNE 18 REPUBLICATIONS OF FALSE STATEMENTS IN DEFENDANTS' APRIL 8 MEMO**
(*Against All Defendants*)

181. DiBella repeats, re-alleges, and incorporates by reference paragraphs 1–121 as if set forth fully herein.

---

[27] Michael Phillips, *Lou DiBella's dog bit Diamond District developer on Flying Squirrels opening night, according to account from Thalhimer execs*, The Richmonder (June 1, 2026), https://www.richmonder.org/lou-dibellas-dog-bit-diamond-district-developer-on-flying-squirrels-opening-night-according-to-account-from-thalhimer-execs-2/.

[28] According to data from SimilarWeb, an independent, third-party traffic analytics tool, in June 2026, the Richmonder.org website had 104,488 monthly unique visitors.

182. Defendants published the following false and defamatory statements concerning DiBella in a memo sent to Rodgers, Ebert, Mayor Avula, and other City officials dated April 8, 2026:

> … Lou and Larry continued to corner Jason and told him that if he and Diamond District Partners (DDP) don't relinquish control of a parcel of land outside the ballpark and sell it to them to develop, that ***Lou himself would do everything in his power to put DDP out of business***, adding that if DDP tries to develop that parcel ourselves, that he ***(Lou) would come after Jason and his family with everything he has.***
>
> Jason rebuffed Lou, claiming that he was willing to continue to discuss a lease of the property (potential lease negotiations have been ongoing between DDP and the Squirrels), but not under these kinds of threats. (Emphasis added.)

183. Defendants' statements are false and defamatory as explained above in Count II.

184. On information and belief, Defendants knew when they published this memo to Rodgers, Ebert, Mayor Avula, and others that it would be provided to the media in response to public records requests. The media regularly requests public records relating to the Diamond District.

185. On information and belief, to ensure that the media ***would*** request the memo, Defendants told at least one reporter—most likely Jonathan Spiers—and possibly other reporters, of its existence, and encouraged them to seek it from the City through a FOIA request. Defendants did so before DiBella even filed his original Complaint—meaning that regardless of whether DiBella brought this lawsuit, Defendants would have used the media to spread their false and defamatory narrative to the public.

186. As a natural, probable, and intended consequence of Defendants' publication of this memo to Rodgers, Ebert, Mayor Avula, and other City officials—and leaking its existence to the media—it was subsequently provided to and / or obtained by members of the media, who repeated and republished Defendants' false and defamatory claims.

187. On June 1, 2026, Richmond BizSense published an article titled "'Sorry about last night': Thalhimer memo sheds more light on opening-night face-off with Squirrels owner," which says:

> The memo goes on to say that DiBella and Botel "continued to corner" Guillot and told him that if he and DDP didn't agree to sell them a plot of land beside the ballpark's entrance that's planned for a retail building and sports bar restaurant, that DiBella himself "would do everything in his power to put DDP out of business" and that if DDP tried to develop the parcel itself, DiBella "would come after (Guillot) and his family with everything he has."[29]

188. On June 18, 2026, Richmond BizSense published another article titled "Emails: Squirrels owners offered $1.75M for disputed parcel beside CarMax Park; Thalhimer wanted $3M," which says:

> In a memo that Guillot sent to city officials the following day recounting the opening night encounter, Guillot said DiBella and Botel told him that if he and DDP didn't agree to sell the plot of land, DiBella "would do everything in his power to put DDP out of business" and would "come after" Guillot and his family "with everything he has" if DDP tried to develop the parcel itself.[30]

189. As a natural and probable consequence of Defendants' original publication of their defamatory statements to Rodgers, Ebert, Mayor Avula, and other City officials and the foreseeable and intended republications of those statements by Richmond BizSense after Defendants alerted the media that the City had the memo, DiBella has suffered substantial economic, reputational, and other damage, as well as embarrassment, humiliation, and emotional distress.

---

[29] Jonathan Spiers, *'Sorry about last night': Thalhimer memo sheds more light on opening-night face-off with Squirrels owner*, Richmond BizSense (June 1, 2026), https://richmondbizsense.com/2026/06/01/sorry-about-last-night-thalhimer-memo-sheds-more-light-on-opening-night-face-off-with-squirrels-owner/.

[30] Jonathan Spiers, *Emails: Squirrels owners offered $1.75M for disputed parcel beside CarMax Park; Thalhimer wanted $3M*, Richmond BizSense (June 18, 2026), https://richmondbizsense.com/2026/06/18/emails-squirrels-owners-offered-1-75m-for-disputed-parcel-beside-carmax-park-thalhimer-wanted-3m/.

190. DiBella has also spent more than $75,000 since April 1, 2026, on a public relations firm in part to try to mitigate the reputational harm caused by Defendants' defamation.

191. Defendants are liable for the harm caused by Richmond BizSense's republications of Defendants' false and defamatory statements to its hundreds of thousands of readers and a global internet audience.[31]

192. In view of the foregoing, DiBella is entitled to actual, presumed, and punitive damages in amounts to be specifically determined at trial.

## COUNT FIVE
## DEFAMATION PER SE FOR WRIC ABC 8 NEWS' JUNE 5 REPUBLICATION OF FALSE STATEMENTS IN DEFENDANTS' APRIL 8 MEMO
(*Against All Defendants*)

193. DiBella repeats, re-alleges, and incorporates by reference paragraphs 1–121 as if set forth fully herein.

194. Defendants published the following false and defamatory statements concerning DiBella in a memo sent to Rodgers, Ebert, Mayor Avula, and other City officials dated April 8, 2026:

> … Lou and Larry continued to corner Jason and told him that if he and Diamond District Partners (DDP) don't relinquish control of a parcel of land outside the ballpark and sell it to them to develop, that ***Lou himself would do everything in his power to put DDP out of business***, adding that if DDP tries to develop that parcel ourselves, that he ***(Lou) would come after Jason and his family with everything he has.***
>
> Jason rebuffed Lou, claiming that he was willing to continue to discuss a lease of the property (potential lease negotiations have been ongoing between DDP and the Squirrels), but not under these kinds of threats. (Emphasis added.)

195. Defendants' statements are false and defamatory as explained above in Count II.

---

[31] According to data from SimilarWeb, in June 2026, the RichmondBizSense.com website had 114,441 monthly unique visitors.

196. On information and belief, Defendants knew when they published this memo to Rodgers, Ebert, Mayor Avula, and others that it would be provided to the media in response to public records requests. The media regularly requests public records relating to the Diamond District.

197. On information and belief, to ensure that the media ***would*** request the memo, Defendants told at least one reporter—most likely Jonathan Spiers—and possibly other reporters, of its existence, and encouraged them to seek it from the City through a FOIA request. Defendants did so before DiBella even filed his original Complaint—meaning that regardless of whether DiBella brought this lawsuit, Defendants would have used the media to spread their false and defamatory narrative to the public.

198. As a natural, probable, and intended consequence of Defendants' publication of this memo to Rodgers, Ebert, Mayor Avula, and other City officials—and leaking its existence to the media—it was subsequently provided to and / or obtained by members of the media, who repeated and republished Defendants' false and defamatory claims.

199. On June 5, 2026, WRIC ABC 8 News published an article titled "CarMax Park defamation lawsuit left out alleged dog attack," which says:

> According to the account, DiBella and Larry Botel, DiBella's business partner, cornered Guillot and allegedly told him that if he and Diamond District Partners did not relinquish control of a certain parcel of land outside the ballpark and sell it to them to develop, that DiBella himself would do everything in his power to put Diamond District Partners out of business.
>
> The memo notes that he added that if Diamond District Partners attempted to develop that parcel themselves, that DiBella would allegedly come after Guillot and his family with everything he has.

> Per the memo, Guillot rebuffed Lou, claiming that he was willing to continue to discuss a lease of the property, but not under these kinds of threats.[32]

200. As a natural and probable consequence of Defendants' original publication of their defamatory statements to Rodgers, Ebert, Mayor Avula, and other City officials and the foreseeable and intended republication of those statements by WRIC ABC 8 News after Defendants alerted the media that the City had the memo, DiBella has suffered substantial economic, reputational, and other damage, as well as embarrassment, humiliation, and emotional distress.

201. DiBella has also spent more than $75,000 since April 1, 2026, on a public relations firm in part to try to mitigate the reputational harm caused by Defendants' defamation.

202. Defendants are liable for the harm caused by WRIC ABC 8 News' republication of Defendants' false and defamatory statements to its hundreds of thousands of readers and a global internet audience.[33]

203. In view of the foregoing, DiBella is entitled to actual, presumed, and punitive damages in amounts to be specifically determined at trial.

**COUNT SIX**
**DEFAMATION PER SE FOR WTVR CBS 6 NEWS RICHMOND'S JUNE 6 REPUBLICATION OF FALSE STATEMENTS IN DEFENDANTS' APRIL 8 MEMO**
(*Against All Defendants*)

204. DiBella repeats, re-alleges, and incorporates by reference paragraphs 1–121 as if set forth fully herein.

---

[32] Claire Gehlich, *CarMax Park defamation lawsuit left out alleged dog attack*, WRIC ABC 8 News (June 5, 2026), https://www.wric.com/news/taking-action/squirrels-defamation-suit-alleged-dog-attack-memo/.

[33] According to data from SimilarWeb, in June 2026, the Richmonder.org Website had 732,089 monthly unique visitors.

205. Defendants published the following false and defamatory statements concerning DiBella in a memo sent to Rodgers, Ebert, Mayor Avula, and other City officials dated April 8, 2026:

> … Lou and Larry continued to corner Jason and told him that if he and Diamond District Partners (DDP) don't relinquish control of a parcel of land outside the ballpark and sell it to them to develop, that ***Lou himself would do everything in his power to put DDP out of business***, adding that if DDP tries to develop that parcel ourselves, that he ***(Lou) would come after Jason and his family with everything he has.***
>
> Jason rebuffed Lou, claiming that he was willing to continue to discuss a lease of the property (potential lease negotiations have been ongoing between DDP and the Squirrels), but not under these kinds of threats. (Emphasis added.)

206. Defendants' statements are false and defamatory as explained above in Count II.

207. On information and belief, Defendants knew when they published this memo to Rodgers, Ebert, Mayor Avula, and others that it would be provided to the media in response to public records requests. The media regularly requests public records relating to the Diamond District.

208. On information and belief, to ensure that the media ***would*** request the memo, Defendants told at least one reporter—most likely Jonathan Spiers—and possibly other reporters, of its existence, and encouraged them to seek it from the City through a FOIA request. Defendants did so before DiBella even filed his original Complaint—meaning that regardless of whether DiBella brought this lawsuit, Defendants would have used the media to spread their false and defamatory narrative to the public.

209. As a natural, probable, and intended consequence of Defendants' publication of this memo to Rodgers Ebert, Mayor Avula, and other City officials—and leaking its existence to the media—it was subsequently provided to and / or obtained by members of the media, who repeated and republished Defendants' false and defamatory claims.

210. On June 6, 2026, WTVR CBS 6 News Richmond published an article titled "Dog bite, threats and a lawsuit: What memo reveals about Diamond District feud," which says:

> A memo sent to city officials by Thalhimer executives alleges Lou DiBella's dog bit a developer and he threatened to ruin the Diamond District project. ...
>
> Thalhimer executives allege Flying Squirrels owner Lou DiBella threatened them and let his dog bite a developer on CarMax Park opening night. ...
>
> The memo further alleges DiBella cornered Guillot and threatened that if Guillot did not sell a parcel of land outside the ballpark to the Squirrels, he would "do everything in his power" to put the Diamond District partners out of business. DiBella allegedly added he "would come after Guillot and his family with everything he has" and threatened to "[expletive] slap" Guillot.[34]

211. As a natural and probable consequence of Defendants' original publication of their defamatory statements to Rodgers, Ebert, Mayor Avula, and other City officials and the foreseeable and intended republication of those statements by WTVR CBS 6 News Richmond after Defendants alerted the media that the City had the memo, DiBella has suffered substantial economic, reputational, and other damage, as well as embarrassment, humiliation, and emotional distress.

212. DiBella has also spent more than $75,000 since April 1, 2026, on a public relations firm in part to try to mitigate the reputational harm caused by Defendants' defamation.

213. Defendants are liable for the harm caused by WTVR CBS 6 News Richmond's republication of Defendants' false and defamatory statements to its hundreds of thousands of readers and a global internet audience.[35]

---

[34] Tyler Layne, *Dog bite, threats and a lawsuit: What memo reveals about Diamond District feud*, WTVR CBS 6 News Richmond, (June 6, 2026), https://www.wtvr.com/news/local-news/richmond/thalhimer-executives-memo-diamond-district-feud-june-6-2026.

[35] According to data from SimilarWeb, in June 2026, the wtvr.com website had 820,993 monthly unique visitors.

214. In view of the foregoing, DiBella is entitled to actual, presumed, and punitive damages in amounts to be specifically determined at trial.

**COUNT SEVEN**
**DEFAMATION PER SE FOR THE RICHMOND TIMES-DISPATCH'S JUNE 8 REPUBLICATION OF FALSE STATEMENTS IN DEFENDANTS' APRIL 8 MEMO**
(*Against All Defendants*)

215. DiBella repeats, re-alleges, and incorporates by reference paragraphs 1–121 as if set forth fully herein.

216. Defendants published the following false and defamatory statements concerning DiBella in a memo sent to Rodgers, Ebert, Mayor Avula, and other City officials dated April 8, 2026:

> … Lou and Larry continued to corner Jason and told him that if he and Diamond District Partners (DDP) don't relinquish control of a parcel of land outside the ballpark and sell it to them to develop, that ***Lou himself would do everything in his power to put DDP out of business***, adding that if DDP tries to develop that parcel ourselves, that he ***(Lou) would come after Jason and his family with everything he has.***
>
> Jason rebuffed Lou, claiming that he was willing to continue to discuss a lease of the property (potential lease negotiations have been ongoing between DDP and the Squirrels), but not under these kinds of threats. (Emphasis added.)

217. Defendants' statements are false and defamatory as explained above in Count II.

218. On information and belief, Defendants knew when they published this memo to Rodgers, Ebert, Mayor Avula, and others that it would be provided to the media in response to public records requests. The media regularly requests public records relating to the Diamond District.

219. On information and belief, to ensure that the media ***would*** request the memo, Defendants told at least one reporter—most likely Jonathan Spiers—and possibly other reporters, of its existence, and encouraged them to seek it from the City through a FOIA request. Defendants did so before DiBella even filed his original Complaint—meaning that regardless of whether

DiBella brought this lawsuit, Defendants would have used the media to spread their false and defamatory narrative to the public.

220. As a natural and probable consequence of Defendants' publication of this memo to Rodgers, Ebert, Mayor Avula, and other City officials—and leaking its existence to the media—it was subsequently provided to and / or obtained by members of the media, who repeated and republished Defendants' false and defamatory claims.

221. On June 8, 2026, the Richmond Times-Dispatch published an article titled "5 things to know about the Diamond District defamation lawsuit," which says:

> As the conversation continued, DiBella said that if the developers did not sell the property to the Squirrels, he would do everything in his power to put them out of business. He would "come after Jason and his family with everything he has," the letter states.[36]

222. As a natural and probable consequence of Defendants' original publication of their defamatory statements to Rodgers, Ebert, Mayor Avula, and other City officials and the foreseeable and intended republication of those statements by the Richmond Times-Dispatch after Defendants alerted the media that the City had the memo, DiBella has suffered substantial economic, reputational, and other damage, as well as embarrassment, humiliation, and emotional distress.

223. DiBella has also spent more than $75,000 since April 1, 2026, on a public relations firm in part to try to mitigate the reputational harm caused by Defendants' defamation.

---

[36] Eric Kolenich, *5 things to know about the Diamond District defamation lawsuit*, Richmond Times-Dispatch (June 8, 2026), https://richmond.com/news/local/business/article_08236e7d-09b5-4abe-ab10-2522bf68cef2.html.

224. Defendants are liable for the harm caused by the Richmond Times-Dispatch's republication of Defendants' false and defamatory statements to its hundreds of thousands of readers and a global internet audience.[37]

225. In view of the foregoing, DiBella is entitled to actual, presumed, and punitive damages in amounts to be specifically determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lou DiBella respectfully requests that the Court enter judgment in his favor and against Defendants Jason Guillot and Thalhimer Realty Partners, Inc. as follows:

(1) Awarding DiBella actual, presumed, and punitive damages of tens of millions of dollars in amounts to be specifically determined at trial;

(2) Awarding DiBella all reasonable expenses authorized by law, including but not limited to reasonable attorneys' and other fees incurred or needed to mitigate the harm caused by Defendants' defamation and tortious conduct;

(3) Awarding DiBella all reasonable costs and attorneys' fees authorized by law spent in bringing this action to vindicate his reputation and good name;

(4) Awarding DiBella all costs, disbursements, fees, and pre- and post-judgment interest as authorized by law;

(5) Issuing a narrowly tailored injunction to prohibit Defendants from repeating or republishing the false claim that DiBella threatened Guillot and his family if Defendants did not sell DiBella the 0.8-acre parcel;

---

[37] According to data from SimilarWeb, in June 2026, the Richmond.com website had 268,231 monthly unique visitors.

(6) Issuing a narrowly tailored injunction to prohibit Defendants from repeating or republishing the false claim that DiBella threatened to put Diamond District Partners out of business if Defendants did not sell DiBella the 0.8-acre parcel; and

(7) Awarding DiBella such other and additional relief and remedies as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff Lou DiBella demands a jury on all claims and issues triable by way of jury.

Dated: August 27, 2026

Respectfully Submitted,

*/s/ Nicholas J. Brechbill*

Nicholas J. Brechbill (VSB No. 99822)
Carolyn M. Wesnousky (admitted *pro hac vice*)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Tel: (202) 628-7400
Fax: (202) 478-0475
nick@clarelocke.com
carrie@clarelocke.com

*Attorneys for Plaintiff Lou DiBella*