IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

LOU DIBELLA,
Plaintiff,

v. Civil No. 3:26cv486 (DJN)

JASON GUILLOT, *et al.*,
Defendants.

**MEMORANDUM ORDER**
**(Denying Defendants' Motion to Dismiss)**

Plaintiff Lou DiBella ("Plaintiff" or "DiBella") brings defamation claims against Defendants Jason Guillot and Thalhimer Realty Partners, Inc. ("Thalhimer") (collectively, "Defendants"). This matter comes before the Court on Defendants' Motion to Dismiss (ECF No. 32 ("Motion")) Plaintiff's Second Amended Complaint (ECF No. 31). In his Second Amended Complaint, Plaintiff brings seven counts of defamation and defamation *per se* against Defendants, seeking injunctive relief and "tens of millions of dollars in damages." (ECF No. 31 at 55.) Because Plaintiff has alleged just barely enough to clear Rule 12(b)(6)'s low bar, his suit survives — for now. But the Court warns the parties that it will not look kindly upon any attempt to waste judicial resources for the airing of petty grievances. The law cares not for such trifles. *Wisconsin Dep't of Rev. v. William Wrigley, Jr. Co.*, 505 U.S. 214, 231 (1992). For the reasons set forth more fully below, the Court hereby DENIES Defendants' Motion (ECF No. 32).

# I. BACKGROUND

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept Plaintiff's well-pleaded factual allegations as true, though the Court need not accept Plaintiff's legal conclusions. *Aschcroft v. Iqbal*, 556 U.S. 662, 678 (2009). With this principle in mind, the Court accepts the following facts.

## A. The Diamond District Project

Navigators Baseball LP owns the Minor League Baseball team named the Richmond Flying Squirrels (the "Squirrels"). (ECF No. 31 ¶ 13.) DiBella, Navigators Baseball LP's managing partner, helped move the Squirrels to the city of Richmond, Virginia ("Richmond" or the "City") in 2009. (*Id.* ¶ 28.) The Squirrels initially played in a "run-down" stadium known as the "Diamond." (*Id.* ¶ 29.) At that time, the City promised to build the Squirrels a new stadium within three years. (*Id.* ¶ 31.) Belatedly, in December 2021, the City launched a public search for a private partner to lead a proposed $2.4 billion mixed-use development called the Diamond District (the "Diamond District Project"). (*Id.* ¶ 32.) The Diamond District Project would feature a new Squirrels stadium "as its anchor property," retail and office space, a hotel, multi-family residential units and public parks. (*Id.* ¶¶ 32–33.) The Richmond Economic Development Authority ("EDA"), a governmental entity that aims to "attract, retain, and support business in Richmond," oversees the Diamond District Project. (*Id.* ¶ 19.) In September 2022, RVA Diamond Partners LLC — of which Defendant Thalhimer was a member — won the bid to develop the Diamond District. (*Id.* ¶ 35.)[1] DiBella quickly developed concerns about RVA Diamond Partners LLC's ability to timely complete the Squirrels' stadium. (*Id.* ¶¶ 38–40.)

---

1 Defendant Jason Guillot, the principal of Defendant Thalhimer, works as a commercial real estate developer. (*Id.* ¶ 14.)

According to Plaintiff, Defendants initially "appeared disinterested in or incapable of designing and overseeing construction of a top-notch, modern professional baseball stadium that would meet MLB requirements and satisfy the Squirrels' needs," and thereafter "consistently failed to meet milestones to deliver the stadium on time." (*Id.* ¶¶ 37–38.)

In September 2023, during a meeting between Plaintiff, developers (including Defendants), City officials and representatives from Major League Baseball, the City accepted DiBella's proposal that the Squirrels' owners take over the stadium's development (*Id.* ¶¶ 49–50.)

The City then gave a portion of the Diamond District to the Squirrels to build the new stadium. Over the Squirrels' objection, the plot did not include a 0.8-acre parcel of land adjacent to the planned entrance to the stadium (the "Parcel") that later became a "source of tension" between the parties. (*Id.* ¶¶ 51, 61.) DiBella and the Squirrels tried to buy or lease the Parcel multiple times, but Thalhimer rejected those offers "to retaliate against DiBella and the Squirrels for taking over the stadium project." (*Id.* ¶ 52.)

**B. The "Heated" Conversation Between DiBella and Guillot**

On April 7, 2026, the Squirrels played their first game in the new stadium. (*Id.* ¶ 54.) DiBella, Guillot and Squirrels' co-owner Larry Botel all attended. (*Id.* ¶ 55.) Botel sought out Defendant Guillot at the game and spoke with him in a hallway near the team's offices in the stadium. (*Id.* ¶ 59.) DiBella joined the conversation and began discussing the Diamont District Project, noting his concerns that "Thalhimer and the City were not living up to their promises to develop the remaining land in a timely fashion." (*Id.* ¶¶ 59, 61.) DiBella expressed his frustration with Guillot and told him that he believed Guillot and Thalhimer lied to the City during the bidding process to develop the Diamond District. (*Id.* ¶ 62.) DiBella said that "he felt

obligated to expose the truth about the bidding process and Thalhimer's fraud, and he would hire lawyers if necessary to protect his business." (*Id.*) DiBella also accused Guillot of "trying to compete with the Squirrels on the team's front lawn." (*Id.* ¶ 63.)

During the conversation, Guillot told DiBella: "You know everybody hates you right? The City hates you! I hate you!" (*Id.* ¶ 64.) Guillot — apparently intoxicated — then "continued in a diatribe against DiBella." (*Id.* ¶ 65). DiBella turned to leave after a few minutes, saying that he did not want to talk to Guillot anymore. (*Id.*) As DiBella walked away, Guillot asked: "What are you going to hit me?" (*Id.* ¶ 66.) DiBella "responded unequivocally that he would never hit Guillot," saying "[o]f course not, I would never do that. I don't hit people, but I'd love to bitch slap you." (*Id.* ¶ 66). Guillot yelled back, "c'mon hit me now!" (*Id.*) DiBella repeated that he would not hit Guillot and then paraphrased a movie line, saying, "[b]ut if I did hit you, I'd hit you so hard, I'd hurt your whole family." (*Id.*) According to Plaintiff, he meant this as a joke, and "Guillot could not have construed DiBella's statement as a threat of harm." (*Id.* ¶ 67.) Guillot did not appear frightened or threatened, nor did he move, flinch or do anything to indicate that he felt threatened by DiBella. (*Id.* ¶ 68). After that, DiBella returned to his suite. (*Id.* ¶ 66.)

**C. Guillot's Messages to Angie Rodgers**

After the encounter, Guillot texted Angie Rodgers, the Director of Economic Development at EDA. (*Id.* ¶¶ 70–71.) As the primary city official overseeing the Diamond District project (*id.* ¶ 79), Rodgers has "substantial influence" over DiBella and Guillot's business dealings. (*Id.* ¶ 70.) Guillot wrote: "Lou [DiBella] just threatened me and my family. I'm done with him. And he threatened to 'bitch slap me' because we won't sell him that parcel." (*Id.* ¶ 71.) Rodgers replied: "Sorry just called to make sure you are ok. I know you are and can

handle yourself. But what in the entire hell. I think we (the city) have got to call him on this." (*Id.*) The next day, Guillot responded: "Thanks. I feel like I need to document in writing the course of events last night and the threats he made. I may send you guys an email today." (*Id.* ¶ 73.)

DiBella alleges that Guillot "knew this claim was false when he made it," because Guillot participated in the discussion and knew for a fact that "DiBella never threatened him or his family, and DiBella did not try to obtain the 0.8-acre parcel through threats of violence." (*Id.* ¶ 80.) DiBella states that Guillot sought to tarnish DiBella's reputation in the eyes of the City officials overseeing the Diamond District, gain leverage in Thalhimer's commercial disputes with DiBella and retaliate against DiBella for accusing Guillot and Thalhimer of lying during the Diamond District bidding process. (*Id.* ¶ 81.)

**D. Defendants' Memorandum to City Officials**

On April 8, 2026, Guillot sent City officials a memorandum (the "Memo" or "Memorandum") regarding the heated exchange. (*Id.* ¶ 103.) The Memo read, in part:

> Lou and Larry continued to corner Jason and told him that if he and Diamond District Partners (DDP) don't relinquish control of a parcel of land outside his ballpark and sell it to them to develop, that Lou himself would do everything in his power to put DDP out of business, adding that if DDP tries to develop that parcel ourselves, that he (Lou) would come after Jason and his family with everything he has.
>
> Jason rebuffed Lou, claiming that he was willing to continue to discuss a lease of the property (potential lease negotiations have been ongoing between DDP and the Squirrels), but not under these kinds of threats.

(*Id.* ¶ 105.) Guillot signed the Memo in his role as General Manager of Diamond District Partners, LLC. (*Id.* ¶ 104.) Maritza Pechin, Thalhimer's Director of Development, also signed the Memo. (*Id.*) DiBella alleges that Defendants sent the Memo to City officials including Rodgers, Mayor Danny Avula and Sharon Ebert (Deputy Chief Administrative Officer for

Planning & Economic Development) "because they knew (and intended that) the City would share the memo with the media." (*Id.* ¶ 103, 113.)

**E. Publication of the Memorandum in News Media**

Defendants "took affirmative steps to ensure that the media wrote about the memo." (*Id.* ¶ 115.) The day after DiBella filed his original complaint in this action, someone submitted a FOIA request seeking "a copy of a memo sent to city officials including EDA Director Angie Rodgers and Mayor Danny Avula from Jason Guillot with Thalhimer Realty Partners/Diamond District Partners regarding an incident involving Lou DiBella at CarMax Park on April 7, 2026." (*Id.*) No one other than Defendants and the City knew of the existence of the Memo at that point. (*Id.* ¶ 116.) Plaintiff alleges that Richmond BizSense reporter Jonathan Spiers submitted the information request, and that Defendants tipped him off about the Memo's existence so that Spiers could request it through FOIA. (*Id.* ¶ 117). Defendants intended for the media to repeat and publish the contents of Defendants' Memorandum. (*Id.* ¶ 118.)

Between June 1 and June 18, 2026, at least five media outlets published online articles repeating Defendants' statements regarding the exchange. (*Id.* ¶ 120.) Those articles either quoted the Memorandum, summarized it or both. (*Id.* ¶¶ 175, 187, 188, 199, 210, 221.) For example, a *The Richmonder* article stated in part:

> In the memo, written by Guillot and Pechin, they lay out their version of the dispute. They wrote: "Lou and Larry (Botel, one of DiBella's associates) continued to corner Jason and told him that if he and Diamond District Partners (DDP) don't relinquish control of a parcel of land outside the ballpark and sell it to them to develop, that Lou himself would do everything in his power to put DDP out of business, adding that if DDP tries to develop that parcel ourselves, that he (Lou) would come after Jason and his family with everything he has."

(*Id.* ¶ 175 (quoting Michael Phillips, *Lou DiBella's dog bit Diamond District developer on Flying Squirrels opening night, according to account from Thalhimer execs,* THE RICHMONDER

(June 1, 2026), https://www.richmonder.org/lou-dibellas-dog-bit-diamond-district-developer-on flying-squirrelsopening- night-according-to-account-from-thalhimer-execs-2/).)

(*Id.*) After Plaintiff's opposition (ECF No. 36) and Defendants' reply (ECF No. 37), Defendants' Motion to Dismiss is now ripe for judicial review.

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint or counterclaim; it does not serve as the means by which a court will resolve factual contests, determine the merits of a claim or address potential defenses. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a motion to dismiss, the Court accepts the plaintiff's well-pleaded allegations as true and views the facts in the light most favorable to the plaintiff. *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). When deciding a motion to dismiss, a court "draw[s] all reasonable inferences in favor of the plaintiff." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

Under the Federal Rules of Civil Procedure, a complaint or counterclaim must state facts sufficient to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). As the Supreme Court opined in *Twombly*, a complaint or counterclaim must state "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," though the law does not require "detailed factual allegations." *Id.* (citations omitted). Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable."

*Id.* at 555, 570. Thus, a complaint or counterclaim must assert facts more than "merely consistent with" the other party's liability. *Id.* at 557. The facts alleged must "state all the elements of [any] claim." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) and *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

## III. DISCUSSION

Defendants move this Court to dismiss Plaintiff's Second Amended Complaint (ECF No. 31) in its entirety for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (ECF No. 32.) They argue that Plaintiff has failed to plead the falsity of the alleged defamatory statements and that qualified privilege protects Defendants' statements. (ECF No. 33 at 3.) They also claim that the Court must dismiss Counts III–VII on the basis that Plaintiff's republication claims violate the single publication rule, and because Plaintiff fails to allege that the media outlets republished the Memo as a natural and probable consequence of Defendants' actions. (*Id.*) Finally, Defendants seek attorneys' fees and costs under Virginia's Anti-SLAPP statute, Va. Code § 8.01-223.2(c). (*Id.*)

To state a claim for defamation under Virginia law, a plaintiff must adequately plead: (1) publication; (2) of an actionable statement; with (3) the requisite intent. *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (citing *Gazette, Inc. v. Harris*, 229 Va. 1, *cert. denied*, 472 U.S. 1032 (1985)). Defamation claims may be defeated by a claim of privilege, which, in turn, may be overcome if the plaintiff proves malice. *Goulmamine v. CVS Pharmacy, Inc.*, 138 F. Supp. 3d 652, 658–59 (E.D. Va. 2015) (quoting *Great Coastal Exp., Inc. v. Ellington*, 230 Va. 142, 334 S.E.2d 846, 853 (Va. 1985)).

The Court first examines the actionability of the statements in question, then turns to the Defendants' republication arguments and finally addresses whether a qualified privilege protects Defendants' statements. The Court finds that Plaintiff has alleged just enough to survive Defendants' motion to dismiss.

**A. Actionability of the Alleged Statements**

To qualify as actionable under Virginia defamation law, a statement must be both "false and defamatory." *Goulmamine*, 138 F. Supp. 3d at 659. Defendants contest actionability by arguing that, even taking Plaintiff's allegations as true, he has failed to allege that Defendants made any false statements. (ECF No. 33 at 8–12.) At this stage, however, that argument will not carry the day. When a party moves to dismiss a defamation suit on the basis that a statement is not actionable, the Court "presumes falsity." *Goulmamine*, 138 F. Supp. 3d at 659. The Court must "credit the plaintiff's allegation of the factual falsity of a statement," unless Plaintiff alleged falsity vaguely or conclusorily or if an external document incorporated into the complaint contradicts Plaintiff's allegations. *Dangerfield v. WAVY Broadcasting, LLC*, 228 F. Supp. 3d 696, 702 (E.D. Va. 2017) (citing *Chapin*, 993 F.2d at 1092); *see also Lokhova v. Halper*, 995 F.3d 134 (4th Cir. 2021) ("[a]t the 12(b)(6) stage in a defamation case, a court must accept as false any statement which the Complaint alleges to be false") (citations omitted).

Here, Plaintiff has alleged with specificity that Defendant Guillot made false statements about him. Plaintiff claims that Defendant Guillot texted a third person that Plaintiff "threatened [Guillot] and [his] family" and "threatened to 'bitch slap' [Guillot] because" Guillot would not sell Plaintiff the Parcel. (ECF No. 31 ¶ 1.) Additionally, Plaintiff alleges that Guillot sent a Memo to Richmond officials stating that Plaintiff "threatened to 'do everything in his power' to put Guillot and Thalhimer's development company, Diamond District Partners, 'out of business'

if Guillot did not 'relinquish control of [the] parcel of land.'" (*Id.* ¶ 2.) Plaintiff repeatedly alleged the falsity of these claims. (*Id.* ¶¶ 1, 7, 8, 11, 72, 79, 100, 102, 105–108.) The procedural posture of this motion demands that the Court credit Plaintiff's allegations regarding falsity. *Dangerfield*, 228 F. Supp. at 702.

Moreover, Plaintiff has alleged enough to survive even without a presumption of falsity, because the Court must draw all reasonable inferences in Plaintiff's favor at this stage. *Nemet Chevrolet*, 591 F.3d at 253. Plaintiff has alleged specific details of an encounter that, viewing the facts in the light most favorable to him, materially differ from the version of events that Guillot allegedly communicated to City officials. For example, Defendant Guillot stated that Plaintiff threatened him and his family and, specifically, "threatened to 'bitch slap'" Guillot "because we won't sell him that parcel." (ECF No. 31 ¶ 71.) But Plaintiff alleges that he told Guillot at least three times that he would not hit him.

> Guillot goaded DiBella, calling out: "What are you going to hit me?" DiBella responded unequivocally that he would never hit Guillot. He said, "Of course not, I would ***never*** do that. I don't hit people, but I'd love to bitch slap you." Guillot yelled back, "c'mon hit me now!" DiBella again repeated that he would ***not*** hit Guillot and then said an approximate quote from one of his favorite movies, the 1982 film *Diner*, featuring Mickey Rourke and Kevin Bacon. He said, "But if I did hit you, I'd hit you so hard, I'd hurt your whole family."

(*Id.* ¶ 66 (emphasis in original).)

In this context, one could reasonably infer that Plaintiff made clear that he would not hit Guillot. Additionally, Plaintiff sufficiently alleges that Defendant Guillot falsely accused Plaintiff of threatening him to force Defendants to sell him the Parcel. In Plaintiff's telling, which the Court must credit at this stage, Plaintiff did not try to acquire the Parcel from Guillot on the night in question, demand that he relinquish it or condition any threats upon transfer of the

Parcel. (ECF No. 36 at 15 (citing ECF No. 31 ¶ 63).) One could reasonably infer that Defendant Guillot falsely claimed that Plaintiff conditioned threats upon transfer of the Parcel.

Defendants advance a contrary inference. "The 'gist' or 'sting' of the challenged statements is substantially true: Plaintiff confronted Guillot in a heated encounter, Plaintiff made hostile threats tied to the Parcel and Defendants' management of the Diamond District project, and Plaintiff referenced physical harm to Guillot and his family." (ECF No. 33 at 11.) The Court finds Defendants' interpretation of the alleged facts plausible, and that interpretation may well carry the day at a later stage when the Court reviews the incident under a different legal standard and considers a wider body of evidence. But proposing one plausible interpretation does not suffice for Rule 12(b)(6) when Plaintiff also advances a plausible interpretation. *See Houck v. Substitute Trustee Services, Inc.*, 791 F.3d 473, 484 (4th Cir. 2015 ) ("To survive a motion to dismiss, a plaintiff need not demonstrate that . . . alternative explanations are less likely; rather, she must merely advance her claim 'across the line from conceivable to plausible.'" (quoting *Twombly*, 550 U.S. at 570)). Because Plaintiff has pled facts that allow the Court to draw a reasonable inference of falsity, he has sufficiently alleged actionability at this stage.

**B. Republication**

Plaintiff brings five counts of defamation *per se* based on the republication of Guillot's Memorandum by various media outlets. (*Id.* at 43–55.) Defendants argue that the Court must dismiss these five counts for two reasons. (ECF No. 33 at 17.) First, the claims run afoul of the single publication rule. (*Id.*) Second, Plaintiff fails to allege that Defendants' actions naturally

and probably caused the media to republish Guillot's statements. (*Id.*) Though these facts present a close question, the Court rejects Defendants' arguments.

### 1. The Single Publication Rule

In *Lokhova v. Halper*, the Fourth Circuit addressed whether Virginia law precluded additional causes of action for "subsequent distribution of a defamatory statement." 995 F.3d 134, 142 (4th Cir. 2021). Because the Supreme Court of Virginia had not weighed in on the matter, the Court made an *Erie* Guess, determining that "Virginia would follow the 'great majority of states [that] now follow the single publication rule.'" *Id.* (citing *Morrissey v. William Morrow & Co.*, 739 F.2d 962, 967 (4th Cir. 1984)). That rule "permits only one cause of action to be maintained for any single publication, even if heard or read by two or more third persons." *Id.* The rule "aims to 'avoid the overwhelming multiplicity of lawsuits that could result from defamatory statements contained in mass publications such as newspapers and magazines.'" *Id.* (quoting *Armstrong v. Bank of Am.*, 61 Va. Cir. 131, 2003 WL 1960685 at *2 (2003)).

So, this dispute turns on whether the news articles that Plaintiff identified constitute subsequent distributions of a single defamatory publication, or whether they constitute separate republications. In *Lokhova*, the Fourth Circuit determined that "making changes to material already published on a website, or adding substantive material to allegedly defamatory content on a website, could constitute republication, depending on the facts of the case." 995 F.3d at 143. In contrast, hyperlinks do not constitute separate publication, because they do not alter the substance of the original publication. *Lokhova*, 995 F.2d at 142 (citing *In re Phila. Newspapers*, 690 F.3d 161, 174 (3rd Cir. 2012)). Still, *Lokhova* does not squarely resolve this case, because its facts differ from the instant case. *Lokhova* addressed a republication claim based on a hyperlink in a *New York Times* article to a prior article also published by the *New York Times*.

*Id.* at 143. The Court held that the single publication rule barred an additional cause of action for the hyperlink, because "the hyperlink served as a reference for the New York Times' existing audience and did not direct the old article to a new audience." *Id.* The facts alleged here — where Defendant published an allegedly defamatory Memo to city officials, then news media republished the story to the general public with additional editorial content — present a different scenario.

*In re Philadelphia Newspapers*, which *Lokhova* cites, sheds more light on the applicability of the single publication rule here. 690 F.3d 161 (3rd Cir. 2012). There, the Court distinguished between *references* to defamatory content, which merely "call the existence of the article to the attention of a new audience," and *republications*, which "present the defamatory contents of the [original publication] to the audience." *Id.* at 175. A federal court interpreting Virginia law has agreed with this distinction. "The republication exception is meant to give plaintiffs an additional remedy when a defendant edits and retransmits the defamatory material or redistributes the material with the goal of reaching a new audience." *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 879 (W.D. Va. 2016).

Here, Guillot originally published the Memorandum to Richmond City officials, not the public at large. (ECF No. 31 ¶ 103.) He then, according to Plaintiff's allegations, acted to ensure that news media shared the Memorandum to a broader audience. (*Id.* at ¶ 115.) Unlike a hyperlink in one *New York Times* article to another, the articles did not simply *reference* the Memorandum's existence to an audience that had already seen it. They presented the claims made within the Memorandum to a new, larger audience with additional substantive content.

(*Id.* ¶¶ 175, 187–88, 199, 210, 221.) The Court therefore finds that these allegations sufficiently support Plaintiff's republication claims.[2]

### 2. Natural and Probable Consequence

Virginia law precludes a separate cause of action against the original publisher of a defamatory statement when republication "is the independent and unauthorized act of a third party." *Weaver v. Beneficial Financial Co.*, 98 S.E.2d 687, 690 (Va. 1957). On the other hand, a plaintiff may bring a separate cause of action when third party republication "is 'the natural and probable result of what the wrongdoer did.'" *Moore v. Allied Chem. Corp.*, 480 F. Supp. 364, 376 (E.D. Va. 1979) (quoting *Weaver* 98 S.E.2d at 690).

The Court finds that Plaintiff has sufficiently alleged that the media's republication of the Memo naturally and probably resulted from Guillot's actions. Plaintiff alleges that Guillot wrote his allegations in a formal memorandum, rather than sharing them orally, "because [Defendants] knew (and intended that) the City would share the memo with the media." (ECF No. 31 ¶¶ 110, 113–14.) Defendants allegedly informed the media that the Memo existed so that they would request it and publish it. (*Id.* ¶ 117.) While Guillot's submission of the Memorandum would

2 The Court recognizes the important interests that the single publication rule upholds. The rule aims to "avoid the overwhelming multiplicity of lawsuits that could result from defamatory statements contained in mass publications such as newspapers and magazines." *Lokhova*, 995 F.3d at 142. This concern has grown exponentially greater in the Internet age. The Court emphasizes that its decision regarding the single publication rule is highly fact-specific. The Court's interpretation of the single publication rule poses little danger of exposing future defendants to liability based on media republication of their allegedly defamatory statements. Normally, such statements will be barred by the rule prohibiting a separate cause of action against the original publishers of allegedly defamatory statements when republication is the independent and unauthorized act of a third party. As discussed below, the outcome here turns on the fact that Plaintiff alleges that Defendants took affirmative action to ensure that the press obtained and republished the defamatory statements.

likely not suffice on its own, tipping the media off to the existence of an inflammatory document on a matter of public concern does naturally and probably lead to that Memo's republication.

Defendants counter that Plaintiff's lawsuit — not Defendants' conduct — caused the media to seek the document in question. (ECF No. 33 at 19.) But Plaintiff alleges that the FOIA request specifically sought the Memorandum, which the original complaint did not mention, and that the requester could only know existed if Defendants told them. (*See* ECF No. 31 ¶ 115 (alleging that the FOIA request sought "a copy of a memo sent to city officials including EDA Director Angie Rodgers and Mayor Danny Avula from Jason Guillot with Thalhimer Realty Partners/Diamond District Partners regarding an incident involving Lou DiBella at CarMax park on April 7, 2026.")) While Plaintiff's suit may well have spurred media interest in the controversy generally, Plaintiff alleges sufficient facts showing that the lawsuit did not prompt the media to seek the Memorandum specifically. Accordingly, Defendants' actions as alleged by Plaintiff still could reasonably be said to have naturally and probably caused the republication of the Memorandum. Therefore, the motion to dismiss cannot succeed on this ground.

### C. Qualified Privilege

Having concluded that Plaintiff's Second Amended Complaint presents actionable claims for defamation, the Court turns to assess whether a qualified privilege shields Defendants from this action. A "qualified" privilege "protects a communication from allegations of defamation if made in good faith, to and by persons who have corresponding duties or interests in the subject of the communication." *Gov't Micro Res., Inc. v. Jackson*, 624 S.E. 2d 63, 70 (Va. 2006). "Whether a communication is privileged is a question of law." *Cashion v. Smith*, 749 S.E.2d 526, 532 (2013). On the other hand, "whether a defendant has lost or abused a privilege is a question of fact for the jury." *Id.* at 533. The law-fact distinction shapes the inquiry at this

stage, when the Court must accept Plaintiff's well-pleaded allegations as true but decide for itself questions of law. *Nemet Chevrolet*, 591 F.3d at 253.

The Parties do not dispute the legal question: whether the qualified privilege applies in the first instance to Guillot's statements. (*See* ECF No. 33 at 13 (arguing that qualified privilege covers Defendant Guillot's statements); ECF No. 36 at 16 ("Defendants acted with malice and therefore lost the protections of the qualified privilege that ordinarily attaches 'to communications between people on a subject in which they have a duty or interest.'" (citations omitted)).) Rather, they contest the factual question of whether Defendant abused and lost that privilege that otherwise would cover his statements. Accordingly, the Court views Plaintiff's allegations regarding this issue of fact in the light most favorable to him.

The Supreme Court of Virginia has enumerated factors to consider when determining whether a speaker has lost qualified privilege.

> A non-exhaustive list of such elements include[s] a showing that: (1) the statements were made with knowledge that they were false or with reckless disregard for their truth; (2) the statements were communicated to third parties who have no duty or interest in the subject matter; (3) the statements were motivated by personal spite or ill will; (4) the statements included strong or violent language disproportionate to the occasion; or (5) the statements were not made in good faith.

*Cashion*, 749 S.E.2d at 533 (internal citations and quotations omitted). Establishing any one of those elements defeats the privilege. *Id.*

The Court finds that Plaintiff has sufficiently pled that Defendant Guillot abused and lost the qualified privilege. Plaintiff alleges that Guillot made false statements with knowledge of their falsity (ECF No. 31 ¶ 80) in bad faith, motivated by ill will resulting from their business rivalry (*id.* ¶¶ 132–34.) These allegations detail specific facts regarding three of the five elements delineated in *Cashion*: knowledge of falsity, ill will and bad faith. 749 S.E.2d at 533. Plaintiff alleges that Defendant Guillot had "subjective awareness" of the falsity of his

statements, because Defendant Guillot participated in the conversation with Plaintiff and therefore knew that Plaintiff did not threaten to kill Defendant Guillot or his family if Defendant Guillot did not sell the Parcel to Plaintiff. (ECF No. 31 at ¶ 133.) For similar reasons as those explained above, the Court finds that, on review of the Second Amended Complaint, one could reasonably infer that Defendant Guillot knew that Plaintiff did not threaten him or link threats to acquisition of the Parcel. After all, Plaintiff alleges that he repeatedly stated that he would *not* hit Guillot and did not condition threats upon transfer of the Parcel. (*Id.*) These facts, viewed in the light most favorable to Plaintiff, support an inference that Guillot knew that Plaintiff did not threaten him to secure the Parcel but said so anyway.[3]

Additionally, Plaintiff alleges specific facts supporting an inference that Guillot acted with ill will in order to harm Plaintiff's business. (*See, e.g.*, ECF No. 31 ¶ 134 (alleging that Guillot "personally resented" Plaintiff, "leveraged that animus" to try to gain concessions from Plaintiff and "wanted to retaliate against DiBella".))

At this stage, these allegations suffice. The Court may not now attempt to determine whether Guillot in fact knew that Plaintiff did not threaten him or whether Guillot in fact made these allegations out of spite. The Court must instead assume the truth of Plaintiff's well-pled allegations and ask whether Plaintiff has stated a claim for relief. He has.

---

[3] For this reason, the Court also rejects Defendants' argument that Virginia Code § 8.01-223.2 immunizes Defendants' statements. (ECF No. 33 at 17.) That statute does not apply "to any statements that the declarant knew or should have known were false or were made with reckless disregard for whether they were false." Va. Code § 8.01-223.2(B).

### D. Anti-SLAPP

Defendants move for reasonable attorneys' fees and costs under Virginia's Anti-SLAPP statute, Va. Code § 8.01-223.2. Because Defendant has not yet "prevail[ed]" in this legal action, the Court DENIES its motion as premature.

## IV. CONCLUSION

Due to the highly deferential standard that the Court must apply at this stage — and for that reason alone — the Court hereby DENIES Defendants' Motion to Dismiss (ECF No. 32.) To quote legendary Pittsburgh Pirates announcer Bob "the Gunner" Prince, Plaintiff's claims survive "by a gnat's eyelash." And that eyelash may well shrink as litigation progresses.

The Flying Squirrels and the wonderful CarMax Park bring great credit to the City of Richmond. This lawsuit does not. Even accepting Mr. DiBella's account of the events at issue, his conduct can at best be described as boorish. Indeed, his own partner apparently (and justifiably) apologized for his conduct. All parties here would be better served by resolving their disputes at the bargaining table rather than dragging the Court into their sophomoric soap opera, particularly when Defendants may be entitled to attorneys' fees should they ultimately prevail.

Let the Clerk file a copy of this Memorandum Order electronically and notify counsel of record.

It is so ORDERED.

/s/
David J. Novak
United States District Judge

Richmond, Virginia
Dated: October 14, 2026